RICHEY MANOR, INC., d/b/a Richey Manor Nursing Home, Appellant,

v.

Richard SCHWEIKER, Secretary of Health and Human Services, Appellee.

No. 81–1045.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1982.

Decided July 30, 1982.

---

Leonard C. Homer, Washington, D. C., with whom Pamela J. White, Baltimore, Md., was on the brief, for appellant.

David B. Palmer, Dept. of Health and Human Services, of the bar of the District of Columbia Court of Appeals, pro hac vice by special leave of the Court, with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, was on the brief, for appellee. Nathan Dodell, Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellee.

Before EDWARDS and BORK, Circuit Judges, and BONSAL,* Senior District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Petitioner, Richey Manor, Inc., appeals from a judgment of the district court disallowing Medicare reimbursement for certain costs incurred in the purchase and operation of a health care facility (referred to as a "provider" of health services). Petitioner, which is the provider, apparently agrees that reimbursement of the types sought are not called for when 100% of the stock of a provider is purchased and no further transaction occurs. Petitioner contends, however, that when such a stock purchase is followed by a transfer of the facility's assets to a newly created not-for-profit corporation owned by the purchaser, the Medicare regulations entitle the provider to reimbursement for (1) depreciation costs calculated on a basis equal to the purchase price of the stock and (2) interest expense incurred by the purchaser in financing the purchase. We hold to the contrary. Both the language of the regulations and underlying Medicare policies make clear that a provider is not entitled to such reimbursement, and we therefore affirm the judgment of the district court.

## I. BACKGROUND

### A. *Facts*

Petitioner, Richey Manor, Inc., a not-for-profit corporation, operates a skilled nursing care facility. All of Richey Manor, Inc.'s stock is owned by Volunteers of America Care Facilities, Inc. ("VOA Care"), a not-for-profit corporation established by a religious organization to provide health care to the sick and infirm. The way in which the relationship between petitioner and VOA Care came into being is largely determinative of the outcome of this case.

In early 1974, VOA Care began negotiations with the shareholders of the predecessor, for-profit Richey Manor, Inc., to purchase the assets of that corporation. These assets consisted of the nursing care facility now owned by petitioner. The price asked and agreed to was $10,000 per bed for the 119 bed facility. But early in the discussions the Richey Manor shareholders stated that for tax reasons they would sell only stock and not assets. Petitioner's brief states that "[t]o induce VOA Care to purchase stock rather than assets, the selling shareholders agreed to assist VOA Care in

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

the financing of the transaction." Appellant's Brief at 6. That inducement was, of course, effectively a reduction of the real cost to VOA Care.

On April 1, 1974, VOA Care purchased 100% of the stock of Richey Manor, Inc., paying $10,000 per bed. Approximately nine months later, VOA Care converted Richey Manor, Inc. to a not-for-profit corporation. The new Richey Manor, petitioner here, continued to do business with the Medicare program under the original provider agreement.

In September 1974, VOA Care revalued the assets of Richey Manor, Inc. to reflect the purchase price of the stock. Consequently, in its cost report for the fiscal year ending March 31, 1975, Richey Manor claimed depreciation costs based on the purchase price of the stock rather than the depreciated historical cost of the assets at the time of the sale. In addition, Richey Manor sought reimbursement for interest expenses incurred by VOA Care in financing the transaction.

### B. The Medicare Statutory and Regulatory Scheme

This case arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. (1976), which created a comprehensive program of health insurance for the aged and disabled. This program is administered, in part, through contractual arrangements with providers of health services. 42 U.S.C. § 1395cc. Under these arrangements, the federal government reimburses providers for the "reasonable cost" of the services provided. The provider usually arranges reimbursements by appointing a qualified public or private agency as a "fiscal intermediary." The intermediary acts as the Secretary's agent for reviewing claims and making payments. A provider dissatisfied with the fiscal intermediary's disposition of a claim for costs

1. The applicable regulations were located in 20 C.F.R. Part 405 (1977) at the time the transaction occurred. However, in 1977, the regulations were transferred to Title 42. According-

may seek a hearing before the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo. The Board's decision is the final step of agency review unless the Secretary, sua sponte and within 60 days after the provider is notified of the PRRB's decision, reverses or modifies the decision of the PRRB. In practice, this determination is made by the Administrator of the Health Care Financing Administration, to whom the Secretary has delegated his authority.

As noted, the touchstone for determining reimbursement is the concept of "reasonable cost." In the 1972 amendments to the Medicare Act, Congress defined "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. . . ." 42 U.S.C. § 1395x(v)(1)(A). The Department of Health and Human Services ("HHS") has promulgated numerous regulations to give further meaning to the term "reasonable cost."

The governing regulations are found in 42 C.F.R. §§ 405.401 et seq. (1981).[1] Under § 405.415(a)(2), the Medicare program reimburses providers for depreciation of assets based on the historical cost of the assets. "Historical cost" is in turn defined in § 405.415(b)(1) as "the cost incurred by the present owner in acquiring the asset." This cost is the original "basis" upon which depreciation is computed. The basis declines as depreciation is taken. Section 405.415(g) provides that

the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed the fair market value of the facility at the time of the sale. The cost basis for depreciable assets shall not exceed the fair market value of those assets at the time of sale. . . .

ly, all references will be to Title 42 except where the regulation existing at the time of the transaction has since been altered; in such a case, the citation will be to Title 20.

20 C.F.R. § 405.415(g) (1977) (emphasis added).[2] Thus, the Medicare regulations make clear that a purchase of "depreciable assets" for a price greater than its existing basis entitles the purchaser to a stepped-up basis and therefore to a greater depreciation reimbursement.[3] It is undisputed that a simple purchase of stock does not entitle the purchaser to a stepped-up basis.[4] Many transactions, however, are hybrid in nature and are not easily characterized as either a purchase of assets or a purchase of stock.

The most common hybrid is a 100% stock purchase plus a second step, such as a subsequent merger or liquidation of the acquired corporation. Such transactions are problematic because while the form of the transaction is a stock purchase, in substance the transaction may resemble a purchase of assets. For that reason, such transactions have sometimes been accorded a stepped-up basis for depreciation purposes.

In this case, characterization of the transaction (VOA Care's purchase of all the stock of the for-profit Richey Manor and the latter's conversion into a not-for-profit corporation) will determine the outcome. If this transaction constitutes a stock purchase, Richey Manor will receive the seller's basis in the facility; if, on the other hand, the transaction is deemed an asset acquisition, Richey Manor will receive reimbursement based on the much higher purchase price of the stock.

Reimbursement of interest expense is generally governed by 42 C.F.R. § 405.-419(a) (1981) which permits only such interest as is "necessary and proper." This is in turn defined in § 405.419(b)(2)(i) and (ii) which require that the interest "[b]e incurred on a loan made to satisfy a financial need of the provider" and "for a purpose reasonably related to patient care." In addition, loans which result in investments are not considered "necessary." *Id.* The loans here were made to VOA Care to finance the purchase of the for-profit Richey Manor, Inc.'s stock. The question is whether that transaction meets the criteria of the regulations.

### C. The Decisions Below

This litigation began with a decision by the fiscal intermediary not to allow Richey Manor reimbursement for 1975 cost report claims of depreciation based on revalued assets and of the interest costs incurred by VOA Care. Richey Manor appealed to the PRRB which reversed the fiscal intermediary and allowed the claims. The Administrator for the Health Care Financing Administration, acting for the Secretary, reviewed the decision of the PRRB and again reversed. Petitioner appealed the Administrator's decision to the district court, which affirmed. This appeal followed.

## II. Decision

### A. Depreciation

We note at the outset that review of the Secretary's decision is conducted under 42 U.S.C. § 1395oo (f)(1) which in turn incorporates the Administrative Procedure Act's standard of review. Under this standard, the decision of the Secretary may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

2. This regulation has since been revised. The parties agree, however, that the 1977 version is the applicable regulation.

3. Richey Manor attempts to avoid the plain language of § 405.415(g) by noting that it is supplementary to §§ 405.415(a)(2), (b)(1) and (b)(2), which also refer to "depreciable assets." Thus, the argument runs, § 405.415(g) must be read as including non-asset transactions if it is not to be "surplusage." Appellant's Brief at 11. The argument is specious. The sections are complementary. Section 405.415(g) covers the establishment of the cost basis on the purchase of a facility while the other sections

cover related matters such as depreciation. Construing § 405.415(g) according to its plain language does not, therefore, create a problem of surplusage.

4. As noted, the regulations all refer to "depreciable assets," and "[b]asic corporation law indicates that assets of a corporation are owned by the corporate entity, not the stockholders." *American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. 605, 622 (D.D.C.1979), *citing Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).

accordance with law." 5 U.S.C. § 706(2)(A) (1976). It is well established that Congress granted the Secretary broad discretion to develop the "reasonable cost" concept, subject, of course, to the general standard enunciated in 42 U.S.C. § 1395x(v)(1)(A). *See Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977). Deference should be given to the Secretary's decision, and it should be upheld if it is reasonably consistent with the statute. *See Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1211 (5th Cir. 1980). Deference is hardly necessary here, however, because the Secretary's decision is clearly correct.

Richey Manor contends that the hybrid transaction here contains the requisite second step, converting the initial purchase of stock to a purchase of assets, because the assets of the for-profit Richey Manor were transferred to the petitioner. Richey Manor relies on cases in which two-step transactions were treated as asset purchases. In *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9th Cir. 1980), for example, the Ninth Circuit held that the purchase of 100% of a corporation's stock, followed by liquidation of the corporation, constituted a purchase of assets for purposes of Medicare reimbursement. Similarly, in *Memorial, Inc. v. Harris*, 655 F.2d 905 (9th Cir. 1980), the Ninth Circuit held that a 100% purchase of stock followed by liquidation and dissolution of the corporate entity, and a subsequent transfer of the assets to a limited partnership, was also a purchase of assets for reimbursement purposes. *See also Chateau Gardens, Inc. v. Harris*, 497 F.Supp. 133 (E.D.Mich.1980) (relying on *Pacific Coast*, the court found that a 100% stock purchase followed by dissolution should be viewed as a purchase of assets). Recently, the U.S. Court of Claims, also following *Pacific Coast*, held that a 100% purchase of the stock of a provider followed by a merger constituted a purchase of assets for reimbursement purposes. *West Seattle General Hospital, Inc. v. United States*, 674 F.2d 899 [1982 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 31,874, at 933 (Ct.Cl. 1982).

As we explain below, we question the reasoning of these cases. But were we to adopt the Ninth Circuit's analysis, we would still affirm in this case. The rationale of those decisions is not that *any* second step will convert a purchase of stock into a purchase of assets. In each of the cases mentioned, the purchaser eventually owned the assets despite having initially purchased stock, and for that reason only was the transaction treated as a purchase of assets. In this case, by contrast, there has been no liquidation or dissolution, and the purchaser, VOA Care, does not own the assets. (There is something of an anomaly in the fact that VOA Care made the expenditure but a different corporate entity, Richey Manor, remains the provider, and seeks the benefits of the expenditure.) The only effect of the reincorporation of Richey Manor was to shift ownership of the assets from a for-profit corporation to a not-for-profit corporation. As the district court noted, although the providers' *stock* changed hands, the *assets* remained in the hands of the corporate entity of Richey Manor, Inc. Joint Appendix at 396. And, although the corporate entities are not identical, the asset ownership continues to rest with a corporation separate and distinct from the purchaser of the stock.

Because the purchaser never acquired more than stock, this case is more closely analogous to those situations in which 100% stock purchases were deemed not to be purchases of assets. For example, in *American Medical International, Inc. v. Secretary of Health, Education and Welfare*, 466 F.Supp. 605 (D.D.C.1979), aff'd, 677 F.2d 118 (D.C. Cir.1981) (expressly adopting the reasoning of the district court), the district court upheld the Secretary's disallowance of increased depreciation and interest expenses. There had been a 100% stock purchase, but, as with the case now under review, the provider remained a separate corporation and continued to be reimbursed under a Medicare agreement that antedated the stock purchase. *See also Monterey Life Systems, Inc. v. United States*, 635 F.2d 821 (Ct.Cl.1980) (100% stock purchase followed by a conveyance of the assets to the parent

without dissolution of the acquired corporation is not a purchase of assets); *Homan & Crimen*, 626 F.2d at 1208 (100% stock purchase does not entitle purchaser to stepped-up basis: "if the separateness of the corporation and its shareholders is a fiction, it is one which the law has long recognized and will not lightly go behind").

The second step here—the mere conversion of Richey Manor from a for-profit to a not-for-profit corporation—is not a sufficient basis for this court to overlook either basic principles of corporate law or the plain language of the Medicare regulations.

■ We think it necessary to add, however, that we are not persuaded by the reasoning of cases such as *Pacific Coast Medical Enterprises* and would affirm here even if the second step arguably made this transaction into an asset acquisition under general accounting principles or other bodies of law. Accounting and legal principles appropriate in other contexts for other purposes have little persuasive force here because the question before us must be decided according to the Medicare regulations and the policies those regulations were designed to implement.

The Medicare program reimburses providers for depreciation of their assets. This is done by subtracting the ultimate salvage value of the asset from its historical cost and prorating the resulting sum (which is the cost of using the asset) over the useful life of the asset. 42 C.F.R. §§ 405.415(a), (b)(3), and (b)(7) (1981). These estimates are not, of course, always accurate, a fact which may become apparent when the provider sells the asset. The price the provider receives may show that the fair market value of the asset is either lower or higher than the cost basis (historical cost less depreciation). If it is lower, a loss is recognized, and Medicare makes additional payments for reimbursement. But if the selling price is higher than the cost basis, a gain is recognized, and Medicare recaptures the amount by which depreciation reimbursements exceeded actual depreciation. 20 C.F.R. § 405.415(f) (1977). When the seller of the asset realizes a gain and repays excess depreciation reimbursements to Medicare, the purchaser is given a stepped-up basis (the amount paid for the asset) from which to calculate future depreciation and reimbursement.

The recapture provisions of the Medicare regulations apply only to sales of assets, not to sales of stock. 20 C.F.R. § 405.415(f). Thus, if a sale of 100% of a corporation's stock plus a delayed second step is viewed as a purchase of assets, Medicare does not recapture excess depreciation reimbursements made in the past, and yet the purchaser receives a stepped-up basis for larger depreciation in the future.

The result of allowing a stock purchase, whether or not followed by a second step, to be treated as an asset purchase is thus to destroy the symmetry of the regulatory scheme by divorcing a step up in basis from depreciation recapture.[5] This result would defeat the plain meaning of the regulations, the best interests of the Medicare program, and the public policy against unjust enrichment. Yet that is the result Richey Manor seeks here. It would take a very plain showing of the injustice of the contrary result to convince us that Richey Manor should be allowed to succeed.

■ Richey Manor attempts to portray itself as a victim of injustice by claiming that neither it nor its agents "had any actual notice of the adverse reimbursement impact of proceeding with a transaction structured as a stock acquisition to be followed by transfer to a nonprofit membership corporation." Appellant's Brief at 26. This formulation stands the matter on its head. The question is not whether Richey Manor had "actual notice" but whether the regulations misled Richey Manor to believe that revaluation of its assets could be ex-

---

5. The court in *Chateau Gardens*, 497 F.Supp. at 136 n.5, said it was "highly questionable" that recapture need be lost. It may be true, as the court suggests, that there are ways of rewriting the regulations so that a two-step transaction need not prevent recapture, but we deal with the regulations as they stand and see no reason to force Medicare to write different regulations which may raise problems of administration we cannot foresee.

pected. Quite the contrary is true. The regulations gave Richey Manor no reason whatever to believe the transaction would provide a higher basis. Instead, the regulations clearly provide notice to those who read them that a transaction like this is, at best, quite unlikely to justify revaluation. The regulations on this topic consistently speak of the sale of "assets," a strong indication that the purchase of stock, is not covered. *See, e.g.*, 42 C.F.R. §§ 405.415(a), (b)(1), (b)(6), (c), (e), (f); 20 C.F.R. § 405.-415(g) (1977); *cf.* 20 C.F.R. § 405.626(c) (1977) (stating that "a transfer of corporate stock would not, in itself, constitute a change of ownership" for purposes of approving or terminating a provider agreement).[6] Moreover, the regulations show that belatedly treating this transaction as an asset acquisition would enable the seller to avoid recapture and the buyer to gain higher depreciation reimbursements. The patent incompatibility of that result with the plan of the regulations, not to mention common notions of equity, of itself ought to have raised a question for petitioner. Richey Manor, therefore, had no reason to assume it could obtain a stepped-up basis in this fashion and very considerable reason to doubt it.[7] One is forced to conclude that Richey Manor either thought it saw an ambiguity and decided to take a chance or that it carelessly ignored warnings clearly to be seen in the regulations. In either case, no injustice is done by denying revaluation of petitioner's assets.[8]

Richey Manor argues further that refusing a stepped-up basis is unfair because it now has assets in a corporation valued at considerably less than the price VOA Care paid. This affects only the level of depreciation reimbursement payments, however; should VOA Care ever sell Richey Manor's stock or should Richey Manor sell its assets, the price received will be the full market value. It is clear, moreover, that VOA Care has already received at least some compensation for the risk it took—a risk that is now realized—when it agreed to purchase stock instead of assets. To induce VOA Care to take stock, the shareholders of the for-profit Richey Manor agreed to assist VOA Care with financing. We have no way of knowing the dollar value of this inducement, but that a value existed, and that it effectively reduced the negotiated price, is undeniable. In return, the shareholders avoided recapture of excessive depreciation reimbursements. Thus, to permit Richey Manor a cost basis equal to the price VOA Care paid for its stock would create a windfall for everybody except the Medicare Trust Funds, which would be deprived of monies properly theirs. The regulations were designed to prevent precisely this situation, and the Secretary has so applied them.

### B. Interest

■ Richey Manor's claim for reimbursement based on interest expenses incurred in

6. This regulation is now even more explicit: "Transfer of corporate stock ... does not constitute change of ownership." 42 C.F.R. § 489.18(a)(3) (1981).

7. It is curious that neither VOA Care nor its management agent nor Richey Manor bothered to consult the fiscal intermediary who "serve[s] as a center for, and communicate[s] to providers, any information or instructions furnished to it by the Secretary, and serve[s] as a channel of communications from providers to the Secretary...." 42 U.S.C. § 1395h. The opinion of the intermediary is not binding but failure even to ask a question so obviously present seems at least careless.

8. Richey Manor contends that the Secretary is applying his policies retroactively. In 1979, the Secretary amended 42 C.F.R. § 405.415 to provide that revaluation may not be made in the

case of a stock acquisition but may be made in the case of statutory mergers and consolidations between unrelated parties. He also amended § 405.419 to deny reimbursement of interest on loans to finance acquisitions for which revaluation of assets is not permitted. The Secretary's position is that these amendments clarified rather than changed policy. Our discussion of the meaning to be drawn from the preceding regulations, which are applicable here, shows that we agree with the Secretary. *Supra*, at 132–133. Subsequent issuance of detailed regulations is hardly sufficient reason to conclude that earlier regulations were either non-existent or overly vague. Such a rule of construction would deter agencies from ever refining regulations, which would be a most unsound judicial policy.

financing the transaction must also be rejected. Reimbursement for interest is governed by 42 C.F.R. § 405.419(a) which provides funds only for "necessary" interest. "Necessary" interest is in turn defined as interest incurred on a loan made (1) to satisfy a financial need of the provider, or (2) for a purpose reasonably related to patient care. 42 C.F.R. § 405.419(b)(2). The regulation specifically denies reimbursement for interest on "[l]oans which result in ... investments." 42 C.F.R. 405.-419(b)(2)(i).

In this case, the interest was not incurred on a loan made to satisfy the financial needs of the provider. Under 42 U.S.C. § 1395cc, an entity must enter into a contract with the Secretary in order to become a provider. The provider here was Richey Manor; indeed, the provider agreement was not affected by petitioner's reincorporation. It is undisputed that the loans in question were made to VOA Care to finance the purchase of stock. Thus, the interest is being paid not by the provider, Richey Manor, but by VOA Care, a separate and distinct entity. *See Homan & Crimen*, 626 F.2d at 1209; *American Medical International*, 466 F.Supp. at 623.

In addition, the loans were not made for a purpose reasonably related to patient care. In this case, the loans were made for the purpose of purchasing stock—an investment purpose. Purchasing stock is not reasonably related to patient care because the provider may, and presumably will, provide the same services regardless of the purchase of stock since it does not bear the burden of the interest payments.[9] Accordingly, Richey Manor's request for reimbursement based on interest payments made by VOA Care is without merit.

The judgment of the district court is

*Affirmed.*

---

9. Since the transaction in question, the requirement that a loan be "made for a purpose reasonably related to patient care" has been further defined in 42 C.F.R. § 405.419(d). This regulation states that a loan made to finance a capital stock purchase for which revaluation of assets is allowed under § 405.415(*l*) will con-

stitute a loan for a purpose reasonably related to patient care. However, we do not believe that the transaction would qualify for revaluation under § 405.415(*l*), and thus our conclusion that the interest is not reimbursable is not affected by the change in the regulations.