HUMANA, INC., et al., Appellants,

v.

Margaret M. HECKLER, Secretary,
Department of Health and Human
Services.  (Four Cases)

HUMANA OF SOUTH CAROLINA, INC.,
doing business as Coleman-Aimar Hos-
pital, a corporation, Appellant,

v.

Margaret M. HECKLER, Secretary, De-
partment of Health and
Human Services.

Nos. 82–1986, 82–1987, 82–1989,
82–1994 and 82–1995.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1983.

Decided April 2, 1985.

As Amended April 26, 1985.

Lee Calligaro, Washington, D.C., with whom Thomas H. Brock, Washington, D.C., was on the brief, for appellants.

David B. Palmer, Atty. Dept. of Health and Human Services, Washington, D.C., of the Bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of Court, with whom Juan A. del Real, Gen. Counsel and Lynne K. Zusman, Deputy Gen. Counsel, Dept. of Health and Human Services, and Henry R. Goldberg, Atty. Dept. of Health and Human Services, Washington, D.C., were on the brief for appellee.

Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Royce C. Lambert, R. Craig Lawrence and Nathan Dodell, Asst. U.S. Attys., Washington, D.C., entered appearances for appellee.

Before WALD and SCALIA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court PER CURIAM.

PER CURIAM:

Petitioners Humana, Inc. and sixty-four of its subsidiary acute care proprietary hospitals appeal from a district court decision limiting reimbursement under the Medicare Act, Title XVIII of the Social Security Act.[1] Humana argues that reimbursement should be calculated by means of a formula based on all of the costs it actually incurred in providing services to Medicare beneficiaries. The district court, upholding the decision of the Secretary of Health and Human Services (the Secretary), held that certain of these costs were not necessary in the efficient delivery of needed health services and therefore denied reimbursement.

We affirm disallowance of reimbursement for 1) stock maintenance costs, 2) income taxes, and 3) the inclusion of income tax liability in the calculation of equity capital. We also find that the rate of return on equity capital prescribed by the Secretary was reasonable. We vacate the district court's holding disallowing reimbursement for stock acquisition costs when an acquired corporation is liquidated or merged into the acquiring corporation.

## I. BACKGROUND

### A. *The Medicare Statutory Scheme*

In 1965, Congress enacted the Medicare Act[2] (the Act), which created an extensive program of health insurance for the aged and disabled. Part A of the Act[3] entitled participating hospitals to reimbursement for the reasonable costs of medical services with such costs being limited to "the cost actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services."[4] Under the statutory scheme, reimbursable costs include both direct and indirect costs of patient care.[5] Direct costs are those directly related to patient care such as nursing services and medication. Indirect costs include such items as return on equity capital and depreciation of plant and equipment. The Secretary is charged with developing regulations "establishing the methods or method to be used and the items to be included in determining [reasonable] costs."[6]

These appeals challenge the Secretary's determinations regarding certain of these

---

1. 42 U.S.C. §§ 1395–1395xx (1982).

2. *Id.*

3. *Id.* §§ 1395c to i–2 (1982).

4. *Id.* § 1395x(v)(1)(A).

5. *Id.*

6. *Id.*

indirect costs: 1) reimbursement of stock maintenance costs, 2) reimbursement of income taxes, 3) the treatment of tax liability in calculating equity capital, 4) the allowable rate of return on equity, and 5) stock acquisition costs.

### B. *Proceedings Below*

All of these appeals, with the exception of *Humana of South Carolina v. Mathews*,[7] began as the subject of administrative proceedings before the Provider Reimbursement Review Board (PRRB).[8] While *Humana of South Carolina* was pending, Humana's fiscal intermediaries[9] disallowed the reimbursement of certain costs to the hospitals. The hospitals appealed to the PRRB challenging the fiscal intermediaries' disallowance in three areas: 1) the cost of federal and state income taxes, 2) stock maintenance costs, and 3) costs incurred in acquiring new facilities by purchasing one hundred percent of the capital stock of another corporation.

The PRRB held that: 1) Humana was not entitled to reimbursement for income taxes, nor could it exclude income tax liability from the calculation of equity capital; 2) it was entitled to reimbursement for stock maintenance costs; and 3) subsequent to the acquisition of one hundred percent of the capital stock of other hospitals, five of the hospitals in question were entitled to increase their asset valuation while seven were not. The Administrator of the Health Care Financing Administration (HCFA) later reviewed and reversed the portions of the PRRB's decision which ruled in Humana's favor. Humana appealed these adverse decisions of both the PRRB and the HCFA and filed identical claims for the fiscal years ending in 1974 and 1975. In August 1979, Humana amended its complaint[10] to include additional claims in which the PRRB decision represented final agency action.[11] The district court issued its memorandum opinion in August 1982, affirming the Secretary's decision on all issues.

## II. ANALYSIS

### A. *Standard of Review*

The Medicare Act itself[12] incorporates the standard of review set out in section

---

**7.** 419 F.Supp. 253 (D.D.C.1976), *aff'd in part, rev'd in part,* 590 F.2d 1070 (D.C.Cir.1978). This case was filed directly in the district court. The suit challenged the Secretary's method of calculating the rate of return on equity capital to be paid to proprietary hospitals. The district court remanded the case to the Secretary to conduct a study of the factors affecting the economics of proprietary hospitals. 419 F.Supp. at 262. On appeal, this court held that the district court did not have jurisdiction to hear challenges to the rate of return for the post-1973 fiscal years. *See Humana of South Carolina v. Califano,* 590 F.2d 1070 (D.C.Cir.1978). Humana was first required to submit its claims to the primary jurisdiction of the PRRB. On remand, the case was consolidated with two others then pending in the district court.

**8.** *See* 42 U.S.C. § 1395oo (1982).

**9.** Fiscal intermediaries, like the Blue Cross Association, are assigned to review providers' claims and to make the payments on behalf of the Secretary. *Id.* § 1395h (1982). The provider hospitals file claims for payment annually with the fiscal intermediaries. 42 C.F.R. § 405.454(f) (1983). The fiscal intermediary then determines which costs are allowable under the Act and how much reimbursement the provider is entitled to for the year. *Id.* If a provider wishes to contest the intermediary's determination, a hearing before the PRRB may be requested. 42 U.S.C. § 1395oo (1982). The PRRB's decision constitutes final agency action unless the Secretary, acting through the Administrator or Deputy Administrator of the Health Care Financing Administration (HCFA), modifies or reverses the PRRB's determination. *Id.* This final decision is then subject to judicial review pursuant to 42 U.S.C. § 1395oo(f)(1) (1982).

**10.** *Humana, Inc. v. Schweiker,* C.A. No. 81–0853 and *Humana v. Schweiker,* C.A. No. 81–1311 raise identical issues for the fiscal years ending in 1976 and 1977. These claims were disallowed by the Administrator and are included in this appeal.

**11.** Appellee alleges that this court lacks subject matter jurisdiction for Humana's pre-1973 claims. Appellee's Brief at 7a. Since appellants limit their appeal to reimbursement for fiscal years ending 1973 through 1977, we do not find it necessary to address the jurisdictional issue. *See* Appellant's Brief at 4.

**12.** 42 U.S.C. § 1395oo(f)(1) (1982).

706 of the Administrative Procedure Act.[13] As a reviewing court, we are permitted to set aside the Secretary's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[14] It is undisputed that Congress, in the statute, granted broad discretion to the Secretary to develop the "reasonable cost" concept through regulations.[15] The Secretary's interpretations of the statutes that she administers are entitled to great deference.[16] With this standard of review in mind, we consider each of the claims.

### B. *Proprietary Costs*

Proprietary costs are those expenses incurred solely as a result of a hospital's for-profit status. These include the costs associated with attracting private investment capital. The specific proprietary costs at issue here are stock maintenance costs, income taxes, the inclusion of tax liability in calculating equity capital and the rate of return on equity capital. Humana seeks an amount of reimbursement for proprietary costs "limited to a level sufficient to recoup its 'costs,'" including the expenses of attracting investment capital.[17] It argues that all other government programs, except Medicare, allow for reimbursement of all of these costs.[18]

The Secretary contends that these proprietary costs are not costs of patient care as allowed under 42 U.S.C. § 1395x(v)(1)(A).[19] The costs are, in addition, not necessary in the efficient delivery of needed health services as required by 42 C.F.R. § 405.451(a) (1983). The Secretary also maintains that Congress has included recognition of proprietary costs in the allowable rate of return on equity capital, which is based on one and a half times the interest on debt obligations issued by the Federal Hospital Insurance Trust Fund (FHITF).[20] Therefore, in the Secretary's view, no reimbursement for proprietary costs was intended under 42 U.S.C. § 1395x(v)(1)(A), the "reasonable costs" provision of the Act.

### 1. *Stock Maintenance Costs*

■ Stock maintenance costs include Security and Exchange Commission (SEC) filing fees, stock transfer fees, and the costs of shareholder meetings and reports.[21] Humana contends that "these expenses are no different in substance than either incorporation fees or other corporate expenses, which are reimbursed under the Program, or the transaction costs associated with attracting debt financing, which are similarly reimbursed."[22] It cautions that the Secretary's disallowance of reimbursement for these expenses will result in cross-subsidization, the shifting of Medicare costs to non-Medicare patients, which is prohibited under the Act.[23]

The guiding precedent in this circuit is *American Medical International, Inc., v. Secretary of Health, Education and Welfare (AMI).*[24] In *AMI*, the provider hospitals challenged the Secretary's denial of

---

**13.** 5 U.S.C. §§ 701–706 (1982).

**14.** *Id.* § 706(2)(A).

**15.** *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 134 (D.C.Cir.1982). *See Springdale Convalescent Center v. Mathews,* 545 F.2d 943 (5th Cir.1977).

**16.** *Villa View Community Hospital, Inc. v. Heckler,* 728 F.2d 539 (D.C.Cir.1984) (per curiam).

**17.** Appellants' Brief at 30.

**18.** *Id.*

**19.** Appellee's Brief at 40.

**20.** 42 U.S.C. § 1395x(v)(1)(B) (1982).

**21.** Appellants' Brief at 12.

**22.** *Id.*

**23.** *Id.*

**24.** 677 F.2d 118 (D.C.Cir.1981) (per curiam). Although this opinion dealt largely with the issue of collateral estoppel, it explicitly affirmed the portion of the district court's opinion dealing with stock maintenance costs. "For reasons amply delineated by the District Court, we agree that the costs in question are not reimbursable because they were not necessarily incurred in the provision of health-care services to Medicare patients, as is required by the Medicare Act." *Id.* at 119 (footnotes omitted).

reimbursement for various expenses, including stock maintenance costs. The district court drew, and we affirmed, the distinction between reimbursable and non-reimbursable costs based on the purpose they served:

> A crucial distinction must be drawn between costs which are necessary for the maintenance of a corporate structure and those which are necessary for providing medical services. Stock maintenance costs are necessary for a corporation to exist, but medical services can be provided without the corporate form.[25]

Today we reaffirm this distinction. The purpose of the Medicare reimbursement scheme is to refund the cost of providing medical services. These services can be provided in a variety of settings, both proprietary and nonprofit. It is the Secretary's task to ferret out those costs incurred by proprietary hospitals which actually relate to medical care.

The regulations implementing the Act allow reimbursement for both direct and indirect costs.[26] At some point, however, certain indirect costs become too attenuated to be regarded as for the provision of medical services. To make these distinctions, the Secretary employs the primary purpose test,[27] determining the primary purpose of a given activity and its associated cost.

In the case of stock maintenance costs, submitting SEC filings, paying stock transfer fees, and conducting and reporting on shareholder meetings all serve to protect the shareholders and to enhance their investment.[28] While the indirect effect of stock maintenance activities may sometimes benefit medical services, the connection is too indirect. The Act gives no preference to one particular organizational structure. It should not, therefore, subsidize the continuing costs of a provider's choice of corporate structure.

Humana disputes the distinction between stock maintenance costs and incorporation fees and the transaction costs of attracting debt financing.[29] Again, we find the Secretary has rationally exercised her line-drawing authority. The Act is structured to encourage the creation of medical facilities. Incorporation and the securing of adequate debt financing bring such facilities into existence. Reimbursement for these expenses is consistent with the intent of the Act. Once a facility is in existence and medical services are being rendered, however, stock maintenance costs inure primarily to the benefit of shareholders, not patients.

We find Humana's contention that disallowance of stock maintenance costs will result in illegal cost-shifting to non-Medicare patients to be without merit. The prohibition against cross-subsidization applies solely to costs relating to patient care. Since we have determined that stock maintenance costs relate to maintenance of the corporate entity as opposed to the reasonable cost of providing medical care, no cost-shifting has occurred. The Secretary's basis of distinguishing between the costs of patient care and other nonreimbursable costs is both logical and rational.[30]

### 2. Income Taxes

Humana claims to be entitled to reimbursement for the funds expended in satisfying its federal and state income tax liability. It argues that income taxes are a cost of doing business for investor-owned facilities and are always reimbursed by other government programs.[31] In addition, Humana contends that the income tax liability, if not reimbursed, will be passed on to

25. *AMI,* 466 F.Supp. 605, 612–13 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981) (per curiam).

26. *Id.* at 610; *see supra* note 4.

27. *Id.* at 615.

28. *See, e.g., duPont v. Wyly,* 61 F.R.D. 615, 632 (D.Del.1973).

29. *See supra* note 22.

30. *See Sun Towers, Inc. v. Heckler,* 725 F.2d 315 (5th Cir.1984) (disallowing reimbursement for stock maintenance costs based on the reasoning set forth in *AMI*).

31. Appellants' Brief at 14.

non-Medicare patients, resulting in prohibited cross-subsidization.[32]

The Secretary contends that income taxes do not act to increase the cost of providing medical care, only to decrease proprietary facilities' profits.[33] We affirm the Secretary's determination. Income taxes, like any other claimed expense, must be evaluated under the reasonable cost standard of 42 U.S.C. § 1395x(v)(1)(A) (1982). Reasonable costs include only those expenses incurred in the efficient delivery of needed health services. The very concept of income taxes, a tax on earned profits, refutes Humana's claim for reimbursement. Relying on the *AMI* court's approach of looking at the purpose of a given expense, we conclude that income tax liability is not a necessary cost of rendering medical care.[34]

As discussed earlier, medical services are provided in both proprietary and in non-profit facilities. Liability for income taxes comes about only when a proprietary hospital earns a profit. The cost is associated with enhancing the shareholders' investment, not with the provision of medical care.[35] Humana claims that to disallow income tax reimbursement is to differentiate unfairly between proprietary and non-profit hospitals. The statute and its implementing regulations, however, do not require that all hospitals be treated identically, only equitably.[36] Moreover, the allowance of income tax reimbursement could result in extremely disparate treatment among proprietary facilities themselves. The amount of tax owed can depend on a variety of factors, including financial structure, carryover of past losses, or corporate organization. Two hospitals may offer the same medical services and charge the same fees, yet have vastly different tax liabilities.

The fact that certain other governmental programs provide reimbursement for income tax expenses is not an adequate rationale for providing them under Medicare. Humana's argument focuses on public utility case law, an area not analogous to Medicare reimbursement. First, a hospital's decision to enter into a contract with Medicare is voluntary. Hospitals are in no way compelled to participate in the program. In contrast, public utilities are forced to operate within a tightly regulated scheme if they are to operate at all. Second, public utilities are strictly prohibited from setting rates that recoup past losses.[37] Unlike ratemaking in the utility industry, Medicare reimbursements have until recently— and at all times relevant to this litigation— been entirely retrospective and based on actual costs.

We find Humana's contention that denial of reimbursement for income taxes results in cross-subsidization to be without merit. The subsidization prohibited by regulation[38] refers to the shifting of the costs of providing medical services between Medicare and non-Medicare patients. Since in-

---

32. *Id.*

33. Appellee's Brief at 76.

34. The court in *AMI* was faced with slightly different facts than those before us today. In that case, state franchise taxes rather than federal and state income taxes were at issue. By using the analysis already affirmed by this court in its treatment of stock maintenance costs, the district court denied reimbursement for the franchise taxes. The basis for the tax, the generation of net income, was held to be the decisive factor.

> A connection between the tax and the rendering of medical services is essential. Whether such a connection exists can only be determined by a consideration of why the tax is imposed.

*AMI,* 466 F.Supp. 605, 626 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981) (per curiam).

35. The Court of Claims, in a recent case involving the reimbursement of California franchise taxes, stated:

> We cannot read the regulations as plaintiffs would have us do to require the Medicare program to protect profits from the effects of taxation.

*Sierra Vista Hospital v. United States,* 687 F.2d 422, 427, 231 Ct.Cl. 587 (1982).

36. 42 C.F.R. § 405.402(b)(5) (1983).

37. *City of Piqua v. Federal Energy Regulatory Comm'n,* 610 F.2d 950, 954 (D.C.Cir.1979).

38. 42 U.S.C. § 405.402(a) (1983).

come taxes do not fall into this "reasonable cost" category, no cross-subsidization has occurred. Whether income taxes are a cost of doing business for proprietary hospitals and whether they are a cost of providing medical services are two wholly distinct issues. We refuse to take the quantum leap required by Humana's argument of equating the two.

Humana asserts that if income taxes are not reimbursed as part of "reasonable costs," the same tax liabilities must not be included in the calculation of equity capital.[39] Humana would then be entitled to a return on equity capital for the funds used to pay income taxes. The Secretary responds that only net working capital actually available for patient care may properly be included in the calculation of each provider's equity capital.[40] We affirm.

Equity capital includes

(1) the provider's investment in plant, property, and equipment related to patient care ... and

(ii) Net working capital maintained for necessary and proper operation of patient care activities....[41]

Under 42 C.F.R. § 405.429(a) (1983), return on equity capital, based on one and one-half times the interest on debt obligations issued by the Federal Hospital Insurance Trust Fund (FHITF), is allotted for proprietary providers. In order to calculate the net working capital component of equity capital, the provider's current liabilities are subtracted from its current assets. The sole question here is whether income tax

liability must also be subtracted from net working capital.

This question was fully addressed in *AMI*. Explaining why the hospitals' argument against inclusion of income tax liability was inapposite[42] the district court stated:

This approach misses the mark. These regulations do clearly establish that a return on equity capital is only allowed on that portion of equity capital related to patient care. Therefore, liabilities not related to patient care (such as ... taxes based on net income) must be *subtracted from working capital* to arrive at the net working capital necessary and proper for patient care services. This is accomplished by *including* the ... tax liability in the return on equity capital computation.[43]

Income taxes must be subtracted from the hospitals' current assets to arrive at the actual net working capital invested in patient care.[44]

### C. Rate of Return on Equity Capital

■ Humana insists that the rate of return on equity capital permitted by the Secretary,[45] based on one and one-half times the interest on debt obligations issued by FHITF, consistently fails to meet the true cost of attracting capital.[46] It claims that a proprietary hospital's return must be paid under 42 U.S.C. § 1395x(v)(1)(A) (1976), the "reasonable costs" provision, rather than under 42 U.S.C. § 1395x(v)(1)(B) (1976), the subsection dealing with extended care facilities.[47]

---

39. Appellants' Brief at 67.

40. Appellee's Brief at 55.

41. 42 C.F.R. § 405.429(b)(1) (1983).

42. The arguments made against inclusion of income tax liability in *AMI* were parallel to the arguments before us in this case.

43. *AMI*, 466 F.Supp. 605, 627 (D.D.C.1979) (emphasis in original), *aff'd*, 677 F.2d 118 (D.C.Cir. 1981).

44. *See also Sierra Vista Hospital, Inc. v. United States*, 687 F.2d 422, 427, 231 Ct.Cl. 587 (1982) (holding that income taxes must be subtracted from assets in calculating working capital).

45. 42 C.F.R. § 405.429(a) (1983).

46. Appellants' Brief at 8–9.

47. This provision, applicable to nursing homes, states:

Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other allowances to the extent that they reflect similar items. The rate of return recognized pursuant to the preceding sentence for determining the reason-

The reasonable cost provision contains no such fixed formula for a rate of return on equity. Rather, under this provision the amount of each hospital's reimbursement must be evaluated separately. Humana requests·an individualized hearing on the rate of return to which it is entitled.[48]

■ The Secretary responds that a proprietary hospital's rate of return can be claimed only under the extended care facility provision and not under the reasonable cost provision of the Act.[49] Under that section, she argues, HHS lacks statutory authority for individualized rate-making on a hospital-by-hospital basis. We agree with the Secretary's interpretation.

Although the House and Senate conferees who approved the 1966 amendment enacting the extended care facility provision[50] expected the Secretary to "apply similar or comparable principles in determining reasonable costs for reimbursement of proprietary hospitals for services furnished by them,"[51] the plain language of § 1395x(v)(1)(B) must be our guide. On this point, we are bound by our prior opinion in *AMI*, which explicitly affirmed the district court's conclusion that the return on equity capital provision in § 1395x(v)(1)(B) "constitutes the *sole* exception to the basic Medicare principle that reimbursement be limited to those costs actually incurred in providing patient care services."[52] Since *AMI* precludes a finding

that return on equity is payable under § 1395x(v)(1)(A), and since § 1395x(v)(1)(B) authorizes the Secretary to set a single, universal rate of return, we hold that Humana is not entitled to an individual determination of a "reasonable" return on equity.

### D. *Stock Acquisition Costs and Liquidation*

■ In separate transactions conducted between May 17, 1969, and June 18, 1971, Humana acquired 100 percent of the corporate stock of twelve health care facilities, eight of which were subsequently merged or dissolved into Humana or a subsidiary. Humana argues that each of the twelve facilities was "purchased as an ongoing operation" within the meaning of 42 C.F.R. § 405.415(g) (1983),[53] which entitles it to reimbursement for capital costs—including depreciation,[54] interest on loans used to finance the acquisitions,[55] and return on equity[56]—based on its purchase price rather than the cost of the assets to the acquired entities. For transactions in which the acquired facilities remained separate corporations, this claim is foreclosed by *AMI*, which upheld the Secretary's denial of such reimbursement "with respect to the purchase ... of 100 percent of the stock of the [acquired] hospitals...."[57] Humana seeks to distinguish *AMI* on the ground that the "district court evaluated the reimburse-

---

able cost of any services furnished in any fiscal period shall not exceed *one and one-half times the average of the rates of interest,* for each of the months any part of which is included in such fiscal period, *on obligations issued for purchase by Federal Hospital Insurance Trust Fund.* (emphasis added.)

**48.** Appellants' Brief at 8–9, 12–13.

**49.** 42 U.S.C. § 1395x(v)(1)(B) (1982).

**50.** Pub.L. No. 89–713, § 7, 80 Stat. 1107, 1111 (1966).

**51.** H.R.Rep. No. 2317, 89th Cong., 2d Sess. 3 (1966).

**52.** 466 F.Supp. at 613 (emphasis added), *aff'd,* 677 F.2d at 118.

**53.** At all times relevant to this litigation, the portion of the regulation relied on by Humana read:

(g) *Establishment of cost basis on purchase of facility as an ongoing operation.* In establishing the cost basis for a facility purchased as an ongoing operation after July 1, 1966, the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed the fair market value of the facility at the time of the sale.
20 C.F.R. § 405.415(g) (1971).

**54.** *See* 42 C.F.R. § 405.415.

**55.** *See id.* § 405.419.

**56.** *See id.* § 405.429.

**57.** 466 F.Supp. at 622.

ment claims on the basis of its interpretation of § 405.415(a)-(b), and not under § 405.415(g)." [58] However, *AMI's* analysis of non-liquidating stock transactions in fact turned on the *statutory* requirement that only health care *providers* be reimbursed for their reasonable costs of patient care,[59] and the court's reasoning controls the case before us:

> To participate in the Medicare program and to be eligible for Medicare payments, a provider must file an agreement with the Secretary pursuant to 42 U.S.C. § 1395cc. While the agreement is in effect, the Secretary will reimburse the *provider* for its reasonable costs of providing patient care to beneficiaries eligible under the program. Such costs are reimbursable only to the extent that they are "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). The providers in this case are the [acquired] plaintiff hospitals, not Chanco. Both before and after the stock transfer, plaintiff hospitals, not their owners, were and are the providers of medical services within the meaning of the Medicare Act. Only *their* reasonable costs in rendering medical services to beneficiaries can be reimbursed.
>
> ... [I]t would only make sense to allow plaintiff hospitals to be reimbursed for the depreciation costs of assets *that the plaintiff hospitals themselves acquired* because the statute only permits reimbursement for costs "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). This must mean "actually incurred" by

the *provider* because it is the provider that is being reimbursed. Reimbursement for depreciation from a cost established by the expenditure of Chanco, the stockholder, would be to allow reimbursement for costs not "actually incurred" by plaintiff hospitals, the providers, and would, therefore, be contrary to the Act. The regulations reflect this by permitting reimbursement only for the acquisition of facilities, 42 C.F.R. § 405.415 . . . . [60]

The Secretary's construction of § 405.415(g) is thus reasonable, and indeed is required by the underlying statute.[61]

Humana next argues that a step-up in basis is appropriate for the eight transactions in which the stock acquisition was part of a two-step transfer of assets to the acquiror, citing *Pacific Coast Medical Enterprises v. Harris (PCME)*.[62] In that case, PCME acquired 100 percent of the stock of Community Hospital of Los Angeles (Community) in an arms-length transaction, liquidating the acquired company approximately nine months later. The Secretary refused to characterize the transaction as a single purchase of an ongoing provider, but treated the stock purchase and liquidation as distinct events. The stock purchase was analyzed using 42 C.F.R. § 405.626(c) (1979),[63] which established that a transfer of corporate stock "would not, in itself, constitute a change of ownership" requiring the filing of a new Medicare provider agreement.[64] Similarly, the Secre-

---

**58.** Reply Brief for Appellants at 4i.

**59.** *See* 42 U.S.C. §§ 1395f, 1395cc (1982).

**60.** 466 F.Supp. at 622–23 (emphasis in original).

**61.** Humana suggests that § 405.415(g) can include stock transactions if generally accepted accounting principles dictate a step-up in basis on the books of the acquired corporation following the acquisition. But regardless of the appropriate accounting procedures, the acquired company (*i.e.,* the provider) incurs no actual expenses by being acquired. Similarly, the use of the word "purchaser" instead of "provider" in § 405.415(g) does not bolster Humana's case, since under 42 U.S.C. § 1395f (1982), the "purchaser" must be the "provider" in order to be reimbursed. When only stock is pur-

chased, the acquired company remains the "provider" for which reimbursement claims are recognized. *See West Seattle Gen. Hosp. v. United States,* 674 F.2d 899, 901, 230 Ct.Cl. 132 (1982); *Pacific Coast Medical Enter. v. Harris,* 633 F.2d 123, 127 n. 9, 129 n. 21 (9th Cir.1980); 42 C.F.R. § 489.18(a)(3) (1983).

**62.** 633 F.2d 123 (9th Cir.1980).

**63.** Effective May 5, 1980, 42 C.F.R. § 405.626(c) was recodified as amended at 42 C.F.R. § 489.18(a)(3) (1983). *See* 45 Fed.Reg. 22,935 (1980).

**64.** 42 C.F.R. § 405.626(c) (1979). The policy that "[a] transfer of ownership of a provider of services ... render[s] such agreement invalid as between the Secretary and the transferee," 42

tary reasoned, a stock transfer does not constitute a change in ownership of assets for purposes of Medicare reimbursement. The Secretary then analyzed the liquidation of Community under 42 C.F.R. § 405.-427(c)(2) (1983), which states that when a provider obtains facilities from an organization owned or controlled by the provider, the allowable basis is the cost of the facilities to the owned or controlled entity.[65]

The Ninth Circuit found "[t]he common usage and understanding of this transaction [to be] overwhelmingly contrary to the Secretary's characterization."[66] Common business practice, generally accepted accounting principles, the Internal Revenue Service, the Securities and Exchange Commission, and the California Commissioner of Corporations all recognized that PCME's 100 percent stock purchase and liquidation was in substance an *acquisition of assets*,[67] and was therefore a purchase of an ongoing operation entitling the acquiror to a new cost basis. The same principles govern our decision today.[68] As in *PCME*, the Secretary separately analyzes Humana's stock purchases and subsequent liquidations. And as in *PCME*, "the Secretary's characterization of [a liquidating] transaction as two independent events, instead of

a single purchase of an ongoing provider, [is] arbitrary, erroneous and irrational."[69] While permitting reimbursement for asset purchases but not 100 percent stock acquisitions is "reasonable in light of the statute,"[70] it is not reasonable to deny reimbursement for integrated transactions that are, in substance, asset acquisitions. The only possible basis we see for distinguishing Humana's transactions from straightforward asset purchases would be absence of a consistent intent to acquire assets. In *PCME*, the acquiror had intended from the outset of the transaction eventually to transfer to itself the assets of the acquired company.[71] If there is no such intent, then the two-step acquisition is not an *integrated* transaction, and the Secretary's bifurcated analysis is reasonable, if not flatly required by statute.

This analysis is consistent with this court's holding in *Richey Manor, Inc. v. Schweiker*,[72] which involved the purchase of 100 percent of the stock of a for-profit Medicare provider and its subsequent conversion into a not-for-profit corporation. The conversion's only effect

> was to shift ownership of the assets from a for-profit corporation to a not-for-

---

C.F.R. § 405.625(a) (1979), was changed effective May 5, 1980. *See* 45 Fed.Reg. 22,935 (1980). The regulations now provide that "[w]hen there is a change of ownership ..., the existing provider agreement will automatically be assigned to the new owner." *See* 42 C.F.R. § 489.18(c) (1983).

**65.** The Secretary has promulgated regulations, prospectively effective February 5, 1979, *see* 44 Fed.Reg. 6912–13 (1979), that explicitly deny a step-up in basis or reimbursement for interest in two-step statutory mergers. *See* 42 C.F.R. § 405.415(*l*) (1983); *id.* at § 405.419(d)(1)(ii).

**66.** 633 F.2d at 132.

**67.** *Id.*

**68.** Needless to say, common business, accounting and legal understanding cannot compel an interpretation contrary to the evident intent of Congress, *see Richey Manor, Inc. v. Schweiker*, 684 F.2d 130, 135 (D.C.Cir.1982). But it is the normal point of departure in assessing that intent where the object of the statute is to give

effect to the economic reality of a transaction. That is the situation we confront here, where "the congressional policy that those who participate in Medicare be able to receive reimbursement for reasonable costs," *PCME*, 633 F.2d at 132–33, refers to costs that are in economic reality borne by the provider.

**69.** 633 F.2d at 136.

**70.** *AMI*, 466 F.Supp. at 624.

**71.** *See* 633 F.2d at 127. *See also American Medicorp, Inc. v. Schweiker*, 714 F.2d 68, 70 (9th Cir.1983) ("AMI's intent was to acquire the assets of Estudillo"); *West Seattle General Hospital, Inc. v. United States*, 674 F.2d 899, 903 (Ct.Cl.1982) ("[i]t is undisputed that it was always the intention of GHS to follow the stock purchase with a merger"); *Chateau Gardens, Inc. v. Harris*, 497 F.Supp. 133, 135–36 (E.D. Mich.1980) ("Plaintiff had the intent throughout of acquiring the assets as a whole and using them to provide health care services").

**72.** 684 F.2d 130 (D.C.Cir.1982).

profit corporation.... [A]lthough the providers' *stock* changed hands, the *assets* remained in the hands of the [acquired] corporate entity.... And, although the corporate entities are not identical, the asset ownership continues to rest with a corporation separate and distinct from the purchaser of the stock.[73]

So characterized, the transaction closely resembled the kind of stock acquisitions for which courts had previously denied stepped-up treatment.[74]

*Richey Manor* held only that the conversion of the acquired company to non-profit status was not the equivalent of an asset acquisition for purposes of Medicare reimbursement. The panel in dicta, however, criticized *PCME*, and therefore the rationale of our holding today, for failing to take proper account of the "recapture problem" in liquidating transactions, a concern which is also the focus of the Secretary's argument in this case. Depreciation payments to providers are necessarily based on estimates. If the estimated depreciation on an asset exceeds the actual depreciation (due, *e.g.*, to a faulty estimate of an asset's useful life), the provider may recognize gain upon disposition of the depreciated asset, whereupon the Secretary can "recapture" the excess depreciation payments under 42 C.F.R. § 405.415(f) (1983).[75] The *Richey Manor* court was worried that, since this recapture provision does not apply to sales of stock (which is not a depreciable asset), allowing a step-up in basis following a 100 percent stock acquisition would "destroy the symmetry of the regulatory scheme by divorcing a step up in basis [for the purchaser] from depreciation recapture [from the seller]." [76]

The scope of this "recapture problem" is not at all clear. The recapture regulations expressly apply only to the "disposal of a depreciable asset [that] results in a gain or loss...." [77] Since a corporation acquired in a simple stock transaction neither sells depreciable assets nor generally recognizes gain upon a subsequent merger or dissolution, treating a two-step transaction as a stock purchase for purposes of the recapture rules would indeed seem to create the "loophole" feared by the Secretary (and the *Richey Manor* panel). However, if integrated two-step transactions are characterized as asset purchases for purposes of both basis computations *and recapture*, they would trigger recapture obligations

---

73. *Id.* at 134.

74. *See Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1210–12 (5th Cir.1980), *cert. denied*, 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981); *AMI*, 466 F.Supp. at 621–24.

75. Section 405.415(f) reads in part:

(1) *General.* Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost shall be limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included shall be limited to the undepreciated basis of the asset permitted under the program. The treatment of the gain or loss depends upon the manner of disposition of the asset as specified in paragraphs (f)(2) through (f)(6) of this section.

(2) *Bona fide sale or scrapping.* (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the bona fide sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare. The extent to which such gains and losses are included is calculated by prorating the basis for depreciation of the asset in accordance with the proportion of the assets [*sic*] useful life for which the provider participated in Medicare....

....

(3) *Sale within 1 year after termination.* Gains and losses realized from a bona fide sale of depreciable assets within 1 year immediately following the date on which the provider terminates participation in the Medicare program are also included in the determination of allowable cost, in accordance with the procedure specified in paragraph (f)(2) of this section....

76. 684 F.2d at 135.

77. 42 C.F.R. § 405.415(f)(1).

for the "selling" corporation.[78] The Secretary suggests that collecting these obligations would present administrative problems. If the acquired corporation is deemed to have sold assets and thereby to have incurred recapture liability, then following a liquidation this liability devolves upon the shareholders who received the "sale proceeds" (which in fact was payment for their stock). These shareholders may be difficult to locate, and would also no doubt be distressed at the prospect of paying their old corporation's "recapture obligations," especially if the characterization of the transaction as an asset sale depends upon the *acquiror's* intent to acquire assets rather than *their* intent to sell stock. Even these problems can be avoided, however, if one views two-step transactions as *sui generis* for purposes of the Medicare scheme, sharing attributes of both stock and asset acquisitions. That is, if the transaction is characterized as an asset purchase for purposes of *generating* a recapture obligation, and as a stock purchase for purposes of determining the *incidence* of the liability, then the acquiror is simply liable for the recapture obligation its transaction generated. On this mixed analysis, the only stockholder—and hence the only party responsible for depreciation recapture—of the liquidating corporation following a 100 percent stock acquisition, is the acquiror. In the event of a post-acquisition merger, the surviving corporation (*i.e.*, the acquiror) would inherit the recapture liability of the seller under general principles of corporate law. Thus, though we do not here decide the point, we note that the crisis envisioned by the Secretary and the *Richey Manor* panel is not necessarily imminent. Moreover, as far as the present case is concerned, Humana has agreed to assume any recapture liability of the acquired facilities, and the Provider Reimbursement Review Board conditioned its favorable determinations for Humana on the reimbursement issue upon "the Providers' assuming the responsibility to see that the obligations under the Program relating to any gain to the sellers and appropriate recapture of depreciation are met."[79] But even if the existing regulations do not permit collection of recapture, or would make such collection administratively difficult, that seems to us a problem of the Secretary's own creation, which she must remedy. We believe that the requirements of fair reimbursement should determine the character of the recapture regulations, not vice versa.[80]

## III. Conclusion

On all issues other than that of a stepped-up basis for liquidating transactions we affirm the rulings of the District Court, which upheld the determinations of the Secretary. As to that issue, we hold that a stepped-up basis was required for liquidations intended at the time of acquisition. This, we may note, is not precisely the test applied by the Provider Reimbursement Review Board in its decision which the Secretary reversed on other grounds. That decision accorded a stepped-up basis to specified acquisitions which the Board found to have been followed by "subsequent merger or liquidation *within a reasonable time.*"[81] As we hold, however, under the applicable law and regulations the timing of the transaction, while a powerful indicator of intent to liquidate, was

78. *See Chateau Gardens, Inc. v. Harris,* 497 F.Supp. at 136.

79. Hearing Decision No. 77–D89 at 11 (Dec. 1, 1977), J.A. 322 (decision for cost reporting period ending August 31, 1973).

80. *See PCME,* 633 F.2d at 135 n. 39. *Richey Manor* disapproved this position in dicta. *See* 684 F.2d at 135 n. 5 ("there [may be] ways of rewriting the regulations so that a two-step transaction need not prevent recapture, but we deal with the regulations as they stand and see

no reason to force Medicare to write different regulations which may raise problems of administration we cannot foresee"). However, we deal in the first instance with the *reimbursement* regulations, and we see no reason to allow an unreasonable application of these regulations in order to forestall potential problems on a collateral matter. *See Chateau Gardens, Inc. v. Harris,* 497 F.Supp. at 136.

81. Hearing Decision No. 77–D89 at 10, J.A. 321 (emphasis added).

not necessarily sufficient either to require or preclude a stepped-up basis, but the totality of circumstances bearing upon intent should have been considered. In any event, since the Secretary reversed the decision of the PRRB on other grounds, we cannot say that its findings, even as to "reasonable time," were those of the agency. Accordingly, we remand this case to the District Court with instructions that it remand to the agency for determination of the requisite intent and for calculation and payment of any additional sums accordingly due.

*So ordered.*