521 A.2d 62

Doctor's Convalescent Center, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued September 9, 1986, before Judges MACPHAIL and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Suzanne Rauer, Charles O. Barto, Jr. and Associates,* for petitioner.

*Bruce G. Baron,* Assistant Counsel, for respondent.

OPINION BY SENIOR JUDGE BARBIERI, February 12, 1987:

Doctor's Convalescent Center, Inc. (Provider) appeals to this Court the final order of the Department of Public Welfare (DPW) disallowing, upon the recommendation of the Hearing Attorney for the Office of Hearings and Appeals, certain depreciation and interest costs which were submitted for the purpose of calculating medical assistance reimbursements for the fiscal years 1979 and 1980.

Title XIX of the Federal Social Security Act, 42 U.S.C. §§1396-1396q, establishes the Medical Assist-

ance Program which, through participating states, including Pennsylvania[1], provides reimbursement for nursing care services to individuals qualifying for medical assistance. Provider submitted for reimbursement depreciation and interest costs of the partnership Susquehanna Nursing Home Associates (SNHA or partnership) which leases the 200-bed skilled nursing facility to the Provider.[2] SNHA was formed for the purpose of obtaining financing for and building a 120-bed addition to an existing 80-bed skilled nursing facility owned by Susquehanna Nursing Home, Inc. (SNHI), the majority stockholders of which were Dr. Robert R. Grubb and his wife, Romaine Grubb. The partners who joined to form SNHA included SNHI, represented by Dr. Grubb who had obtained a Certificate of Need for the 120-bed facility, James A. Dildine, James T. Dildine, and Daniel Clement, owners of the land on which the facility was to be built, and Marvin J. Rudnitsky, Esquire. A partnership agreement signed on or about June 1, 1976 witnessed the partners' agreement to buy and the Grubbs' agreement to sell all of their stock in SNHI for a purchase price of $1.2 million. The sale was owner-financed, payment to be made in 180 equal monthly installments with interest at six per cent per annum, with

---

[1] *See* Section 443.1 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, §443.1, *added* July 31, 1968, P.L. 904, *as amended,* 62 P.S. §443.1.

[2] Section IV(D)(13) of the Manual provides:

Costs of services, facilities, and supplies furnished by organizations related to the facility by common ownership of more than ten percent equity, contract, control, interlocking directorates or officers will be recognized, at the cost to the related organization.

. . . .

These requirements apply to the sale, transfer, leaseback or rental of the property, plant or equipment or purchase of services of any facility or organization.

the first payment due three years from the date of the delivery of the stock. On October 1, 1976, the shareholders of SNHI, the partners of SNHA, met and resolved to dissolve the corporation. Thus, on October 25, 1976, the corporate assets held by SNHI were transferred to SNHA in exchange for the newly acquired stock.

In submitting its costs reports for fiscal years 1979 and 1980 to DPW for reimbursement, Provider claimed depreciation expense using as a cost basis the $1.2 million purchase price of the stock which was exchanged for the corporate assets. Provider also claimed capital interest expense incurred by SNHA on the purchase-money loans from Dr. Grubb and his wife.

Pennsylvania's guidelines and procedures for cost-related reimbursement are detailed in the Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual).[3] The regulations comprising the Manual were published in their final form in the Pennsylvania Bulletin, dated November 8, 1975, together with an order by the Department of Public Welfare dated September 23, 1975, indicating that the regulations would be adopted effective October 24, 1975.[4] The text preceding the order indicated, however, that the Manual was being adopted in anticipation of the July 1, 1976 implementation of federally-mandated cost-related reimbursement for all private and county skilled nursing and intermediate care facilities, and that, prior to July 1, 1976, facilities would be reimbursed under the current system of maximum flat rates which would be established by the Department for the interim cost reporting periods.

---

[3] The Manual originally appeared at 5 Pa. B. 2928-34 (1975) and has been codified in its current amended form at 55 Pa. Code §§1181.201-1181.274.

[4] The date of the Pennsylvania Bulletin in which the regulations appeared in their final form would be the effective date of the regulations. See 45 Pa. C. S. §903.

DPW disallowed the stepped-up basis of $1.2 million, representing the June 1, 1976 purchase price of the stock pursuant to Manual Section IV(D)(9)(f). Part IV contains a list of selected cost items to be recognized as allowable costs, and directs that in the absence of specific instructions for specific circumstances, reference should be made to the federal Medicare Provider Reimbursement Manual contained in the HIM (Health Insurance Manual) 15. Subpart (D)(9) designates depreciation on capital assets an allowable cost providing certain conditions are met. Subpart (D)(9)(f) indicates that the cost basis for depreciable assets purchased as an ongoing operation shall be the lesser of the purchase price or the fair market value based on the lesser of at least two bona fide appraisals at the time of the sale and less a straight line depreciation by the prior owner. The sale must be an arm's length transaction consummated in the open market between non-related parties in a normal buyer-seller relationship.

DPW determined that the transaction between SNHA and SNHI was not "consummated in the open market between non-related parties in a normal buyer-seller relationship," noting that Dr. Grubb possessed significant control with regard to both entities, and, therefore, disallowed the depreciation expense submitted by Provider.

DPW disallowed the interest expense on the purchase money mortgages held by SNHA on the basis that the interest was paid to a lender related to the provider through common ownership or control. Manual Section IV(D)(10) designates necessary and proper interest on both current and capital indebtedness an allowable cost. The term "proper" is defined at Section 200.3 of HIM 15, the federal manual, which stipulates that "the interest must be paid to a lender not related to the provider through common ownership or control."

Provider makes the following arguments on appeal: (1) that the purchase by SNHA of the assets held by SNHI, structured for federal income tax purposes as a purchase of stock and corporate liquidation, was in fact a single transaction occurring on June 1, 1976, prior to the July 1, 1976 implementation of the cost-reimbursement system, and that, therefore, DPW should allow Provider's depreciation basis of $1.2 million, the purchase price of the assets; (2) that assuming arguendo that Section IV(D)(9)(f) may be applied to Provider's claim, that the acquisition of the corporate assets was not a related party transaction; (3) that DPW relied on regulations not in effect prior to July 1, 1976 to deny Provider's interest expense on capital-indebtedness; and (4) in any event, the loans from the Grubbs to the partnership were not loans between related parties.

Thus, with regard to the stock acquisition and liquidation in this case, there are two issues to be decided: whether the acquisition was a related-party transaction and, if so, whether Manual Section IV(D)(9)(f) will operate to prevent Provider from receiving reimbursement for depreciation expense calculated using the stepped-up $1.2 million cost basis. We first address the question whether SNHA's acquisition of SNHI's corporate assets was a related party transaction thereby resolving the necessity of addressing the second question.

The Manual, at the time of the Hearing Attorney's adjudication, did not define "related parties"[5] and, therefore, the Hearing Attorney referenced the federal manual, HIM 15, which, at Section 1002.1, defines

---

[5] The Manual in its current form at 55 Pa. Code §118.202, the definitional section, defines "related party" as "an individual or organization that is associated or affiliated with, or has control of or is controlled by, the provider." The definition continues by stating that " '[c]ontrol' as used in this definition, means the power to influence or direct the actions or policies of another."

"related to the provider," in the context of supply of goods and services, as meaning "that the provider to a significant extent is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities, or supplies." The Hearing Attorney also referenced Section 1002.2 which indicates that "common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider," and "control," which, according to HIM 15 §1004.3,

> includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive not its form or the mode of its exercise. The facts and circumstances in each case must be examined to ascertain whether legal or effective control does, in fact, exist.

Provider submits that application of the tests for common ownership and control to the facts in the instant case preclude a finding that buyer and seller were related parties under either federal or state regulatory principles. Provider does not contest that prior to SNHA's acquisition of SNHI stock, Dr. and Mrs. Grubb had total control of SNHI by virtue of their combined ownership of 75% of the outstanding stock and of Dr. Grubb's position as an officer of the corporation. Subsequent to SNHA's acquisition of stock and liquidation of the corporation, however, Provider asserts, Dr. Grubb's degree of control was substantially reduced from 75% stock ownership to 46% interest in the partnership. The facts and circumstances in this case, Provider asserts, reveal a decided lack of control by Dr. Grubb in dealings of the partnership since, under the partnership agreement, any expenditure greater than $5,000 requires approval of at least 51% of the partnership, and

no real estate belonging to the partnership can be sold unless 70% of the partnership votes favorably.

Clearly, there is no question that the test of common ownership has been met. We believe the test of control as to both entities has been met as well since Dr. Grubb, with a 46% interest in the partnership, has the power to significantly influence actions or policies of the partnership. Indeed, when one considers that no other single partner holds more than a 16% interest in the partnership, Dr. Grubb's power to influence the actions of the partnership cannot be doubted. That he cannot unilaterally direct the actions of the partnership does not alter our conclusion that Dr. Grubb had significant control with regard to both entities, and that, therefore, the buyer and seller in this stock acquisition and corporate liquidation were related parties.

Thus, the next question before us is whether Section IV(D)(9)(f), part of the new system of cost reimbursement implemented July 1, 1976, will operate to prevent the Provider from receiving reimbursement for depreciation expense calculated using the stepped-up $1.2 million cost basis.

The Hearing Attorney had concluded, by deciding that the effective date of the two-step sales transaction was the date of the corporate liquidation in October, 1976, that the Section was applicable. Thus, Provider argues on appeal that the purchase of the corporate assets was a single transaction occurring prior to July 1, 1976. Provider cites in support of its argument *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9th Cir. 1980) in which the Secretary for Health and Human Services had disallowed a revaluation upon liquidation of a hospital's assets since the assets had been purchased prior through an exchange of stock and thus, at the time of the liquidation, there was no change in own-

ership of the assets. The court of appeals held that the Secretary's characterization of the stock purchase and subsequent dissolution as two separate events was contrary to common usage and understanding and that the transaction should be viewed as a single event, one purchase of an ongoing provider. Provider cites *Humana, Inc. v. Heckler*, 758 F.2d 696 (D.C. Cir. 1985) for the same proposition.

DPW, in its reply brief, does not disagree that the stock acquisition and liquidation in the instant case constituted a single transaction. The question on which the parties fail to agree is the effective date of the transaction, the date SNHA and Dr. Grubb agreed to the sale, prior to July 1, 1976, the implementation date of the Manual, or the date of the liquidation, subsequent to July 1, 1976. Provider, of course, asserts that the effective date of the transaction was prior to July 1, 1976, but cites no authority in support of its assertion, DPW would assert that it is not necessary to resolve the issue, however, in light of *Mountain Rest Nursing Home, Inc. v. Commonwealth of Pennsylvania, Department of Public Welfare*, 73 Pa. Commonwealth Ct. 42, 457 A.2d 600 (1983).

In *Mountain Rest*, the provider had claimed reimbursement in 1977 and 1978 for depreciation of the skilled nursing facility the provider had purchased on January 28, 1974. DPW disallowed the claim as Mountain Rest was unable, due to a fire in its accountant's office, to document the prior owner's depreciation which, under Section IV(D)(9)(f), had to be subtracted from the purchase price cost basis. Mountain Rest argued on appeal that DPW had effected a retroactive application of its regulation when it applied Section IV(D)(9)(f) to its facility which had been purchased before the regulation was promulgated. This Court rejected Mountain Rest's argument stating that

a regulation or statute does not operate retroactively simply because some of the facts pertinent to its application came into existence prior to its effective date. . . . [Citations omitted.] [T]he relevant regulations provide for a depreciation allowance under specified circumstances. DPW has applied the regulations to those audit years following the promulgation of the regulations.

73 Pa. Commonwealth Ct. at 45-46, 457 A.2d at 602. Rather than completely disallowing the depreciation expense where the loss of the records was due to no fault of the provider, however, this Court instructed DPW to estimate the cost basis of Mountain Rest's depreciable assets.

The facts in the instant case, similar to and yet different, in a vital way, from the facts in *Mountain Rest* compel this Court to conclude that Section IV(D)(9)(f) was properly applied to preclude reimbursement of Provider's depreciation expense calculated using the stepped-up $1.2 million cost basis. Unlike the sale of the facility in *Mountain Rest,* the sale of the facility in the instant case occurred subsequent to the publication of the pertinent regulation. Stated another way, the pertinent provision of the Manual, Section IV(D)(9)(f), with regard to which Provider had received notice prior to the sale, was in effect at the time of the sale. Cost reimbursement was simply not implemented until July 1, 1976, though well before the date of the reimbursement claims at issue, as in *Mountain Rest*.

Even in the absence of those facts that set this case apart from *Mountain Rest,* we would, for policy reasons, still extend the holding in *Mountain Rest* and apply Section IV(D)(9)(f) to this related party transaction. Prior to implementation of the cost system of reimbursement, nursing facilities participating in Pennsylvania's Medical Assistance program were paid a flat per diem rate vary-

ing according to the level of care provided medical assistance patients. The purpose for implementation of the new system of reimbursement is clear; the federal government and DPW wish to ensure the participation of competent and efficient providers of medical care and, at the same time, to preclude the possibility of a profit incentive for potential providers. Providers of medical care are to receive reimbursement for the cost, no more and no less, of the medical care provided. Section IV(D)(9)(f), specifically, is designed to prevent collusion and the inflation of health care costs that may result. *See Fair Winds Manor v. Commonwealth of Pennsylvania, Department of Public Welfare,* 100 Pa. Commonwealth Ct. 139, 514 A.2d 642 (1986). Were we to accept Provider's argument in the instant appeal that the related parties doctrine may not be applied to preclude reimbursement for depreciation expense claimed in fiscal years subsequent to the promulgation of the doctrine, we believe we would be thwarting the clear intent of the cost reimbursement system.

We find that there was no retroactive application of Section IV(D)(9)(f) in the instant case in disallowing Provider's claim for reimbursement for depreciation expense. This portion of Provider's appeal will be denied.

Finally, we address Provider's arguments with regard to the disallowance of the interest expense on the purchase-money mortgages held by the partnership. Provider asserts that the Hearing Attorney relied upon regulations not in effect at the time the loan agreement was signed. Provider also asserts that the loan was not between related parties.

There can be no question that the purchase-money loans were between related parties. Also, since the partners' agreement specifically provided that no interest was due on the loans until three years after the sale of the stock, no interest, for which reimbursement is

being claimed, was paid until sometime in 1979. Provider cannot dispute that regulations prohibiting reimbursement of interest paid to a related party were well in place under the new reimbursement scheme in 1979. This portion of Provider's appeal will be denied as well.

## ORDER

AND NOW, this 12th day of February, 1987, the order of the Department of Public Welfare, dated August 19, 1985, in the above-captioned matter is hereby affirmed.