CHATEAU GARDENS, INC., a Michigan Corporation, Plaintiff,

v.

Patricia HARRIS, Secretary of the United States Department of Health and Human Services; John T. Dempsey, Director of the Michigan Department of Social Services, Defendants.

No. 80–40165.

United States District Court,
E. D. Michigan, S. D.

June 26, 1980.

Kenneth B. Williams, Lansing, Mich., for plaintiff.

Frank J. Kelly, Atty. Gen., Janis Meija, Robert N. Rosenberg, Asst. Attys. Gen., Lansing, Mich., for defendant-director.

James K. Robinson, U. S. Atty., Detroit, Mich., Robert W. Haviland, Asst. U. S. Atty., Flint, Mich., for defendant-secretary.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

The parties[1] have filed a stipulated statement of facts attached as Exhibit A and incorporated herein by reference. Essentially, the issue concerns Plaintiff's acquisition in 1977 of the assets of an extended care facility by means of a stock purchase and subsequent corporate dissolution transferring the assets of the acquired corporation, under § 334(b)(2) of the Internal Revenue Code, to the Plaintiff.

Under the Medicare/Medicaid regulations, a re-evaluation of the assets of a newly acquired facility (and hence, a redetermination of the amount of Medicaid reimbursement) is allowed when the assets are obtained either by direct purchase or by merger of two unrelated corporations absent a transfer of stock. The then existing policy[2] of the Secretary, based on an interpretation of the regulations, did not permit a re-evaluation in circumstances such as the one presently before this Court. The sole issue here is whether the Secretary's policy is arbitrary or capricious, 5 U.S.C. § 706(2)(A); 42 U.S.C. § 1395oo (f).

Under the regulations, the amount allowed for reimbursement is based on the historical cost of the asset, 42 CFR 405.-415(a), (g). The historical cost is that "incurred by the present owner in acquiring the asset," 42 CFR 405.415(b). Plaintiff asserts that this cost is represented by the price it paid for the stock. As its initial argument in support of the Secretary's decision, HHS asserts that the cost of the stock is not equal to the cost of the assets: that is, under the arrangement here, the price Plaintiff paid for the stock included pay-

---

1. Defendant Department of Health and Human Services (HHS) had filed a Motion to Dismiss on the ground that Plaintiff's contract was only with Defendant Department of Social Services (DSS) and not with HHS. Although the Court agrees with the Secretary's reading of the applicable statutes (42 U.S.C. § 1396; MCLA § 400.105), Defendant DSS has filed a third-party complaint against HHS, maintaining HHS's status as a proper party in this action.

2. This policy is now expressed in 42 CFR 405.-415 which did not go into effect until February, 1979.

ments for a covenant not to compete and for good will; and the subsequent transfer was, in effect, a donation of assets to the surviving corporation after the merger. The underlying assumption of this argument is that the sale and transfer are two separate transactions. This is the very issue to be decided. Is it one transaction for acquiring assets accomplished in two steps (stock acquisition followed by dissolution) or two separate transactions?

HHS's second argument, in which it is joined by Defendant DSS[3], begins as follows: one, the purchase of stock changes only the identity of the stockholders; it does not necessarily change the cost of providing health care. Because the purpose of Medicaid is to reimburse providers for the health care costs of eligible recipients, a stock purchase alone does not justify re-evaluation. Two, the merger of assets by dissolution of the corporation, the stock of which had been acquired, was then between related parties and therefore cannot be considered a change in ownership.

Both of those statements accurately represent the law. The sale of stock in itself does not constitute a change in ownership for purposes of re-evaluation, 42 CFR § 405.626(c). Transactions between related parties cannot be used as a basis for re-evaluation, 42 CFR § 405.427.

However, the case here is not limited *only* to the sale of stock. There is, additionally, the dissolution and transfer of assets. The regulation merely states that the "transfer of corporate stock would not, *in itself,* constitute a change in ownership," (emphasis added). This Court finds the self-limitation of the regulation significant, as did the court in *Pacific Coast Medical Enterprises v. Califano,* 440 F.Supp. 296 (D.C.Cal., 1977), *aff'd.,* 633 F.2d 123 (9th Cir. 1980):

The words, "in itself," suggest that if the particular transaction involves more than the mere transfer of corporate stock, the section's conclusion of no

change of ownership does not necessarily apply. Here, more than a mere stock transfer occurred . . .

Section 405.626 does not provide support for the Secretary's refusal to find a change of ownership . . . *Pacific Coast, supra,* at 306–07.

The government attempts to buttress its argument with the second point noted above, *i. e.,* that the merger and resultant asset acquisition were between related parties. Thus, even assuming the merger and asset acquisition thereby would be a sufficient additional factor in the stock sale to justify a conclusion of changed ownership, those transactions at that time were between related parties and their use for re-evaluation purposes is prohibited by the regulations.

This begs the issue. The government is assuming there are two separate transactions and asserting that the stock sale colors the subsequent transfer with the consequences of a transaction between "related" parties. Just as easily, one could view the transaction in its entirety, one transaction in two steps, and see the arms' length relationship continuing to exist until the acquisition was complete. The question is, at what point in time should the test of being related apply? Given the intent of the parties from the very beginning and the purpose of the regulation (the avoidance of "sweetheart" contracts to increase the basis upon which reimbursement is based), it is the latter assumption which has the stronger rational basis. The government urges that the sale and merger should be viewed as two transactions because Medicaid's purpose is the reimbursement of health care costs and the purchase of stock does not necessarily directly affect that. The logic is circuitous and sophistic.

The transaction here was not solely the sale of stock. Rather, Plaintiff had the intent throughout of acquiring the assets as a whole and using them to provide health

---

**3.** Both DSS and HHS filed briefs in opposition to Plaintiff's position. Defendant DSS states that it is required by state law to follow the mandates of HHS. On the merits, DSS's well-

written brief reiterates the second argument of the federal government. Thus, while this opinion will refer only to HHS's brief, that brief encompasses both Defendants' positions.

care services to the residents. The provision of those services is the very purpose of the reimbursement scheme. The Plaintiff's costs in the acquisition are exactly what Congress intended to reimburse through the Medicaid program. The means used does not affect either Plaintiff's intent or Plaintiff's right to reasonable compensation. This Court is persuaded by the language of the Ninth Circuit in *Pacific Coast v. Califano*, 633 F.2d 123, aff'g 440 F.Supp. 296 (C.D.Cal., 1977).

> . . . a characterization which denies that [Plaintiff's] transaction was a single action acquiring assets infringes upon the congressional policy that those who participate in Medicare be able to receive reimbursement for reasonable costs and return on equity.

Congress has by statute declared that Medicare providers should have the opportunity to recover their reasonable costs. Depreciation expense and return on equity are legitimate costs of doing business and it is Congress' desire as evidenced by statute and by implementing regulations that these costs be fully reimburseable.

However, unless there is the opportunity for reimbursement for depreciation and return on equity to be based on the full cost of assets to the present provider, it is not receiving full reimbursement. Thus, to deny such reimbursement to a

provider who comes in good faith and engages in a fair, bona fide transaction is inconsistent with Congress' desire that they have the opportunity to receive full payment. *Id.*, footnotes omitted.

Defendants attempt to distinguish this case from *Pacific Coast, supra,* on the ground that the Plaintiff in that case had offered to repay the excess depreciation previously allowed.[4]

This Court is not convinced that the distinction is significant. At issue here is the reasonableness of the Secretary's treatment of Plaintiff's acquisition of a facility as two separate and distinct transactions. The Secretary's concern with a collateral issue does not in and of itself justify its decision. The Court agrees with Plaintiff's position:

> This argument [of the Secretary's] likewise assumes that the Defendants have properly refused to treat the Plaintiff's transaction as a purchase of assets. The same argument was rejected by the court in *Homan and Crimen v. Califano*, [CCH Medicare and Medicaid Guide, ¶ 29,213 (W.D.Tex., 1978)], citing in support of its rejection the following testimony of a witness for Defendant Secretary: ". . .. If a purchase of stocks were treated as a purchase of assets, there is not a regulation in existence which would prohibit a recapture of depreciation from the selling corporation. (Plaintiff's brief, p. 11).[5]

4. In a direct sale of assets, the seller is obligated under Medicaid regulations to an adjustment in his allowable cost based on the amount of depreciation allowed him as reimbursable cost. 42 CFR 405.415(f). This cost adjustment is not made in the case of a § 334(b)(2) acquisition. The owner of part-depreciated assets used to provide health care for medicaid recipients and who sells those assets for a price in excess of the depreciated value has, in effect, been reimbursed under the medicaid program for assets which did not in fact depreciate (as established by the sales price). Hence, if the seller could retain that portion of the amount previously reimbursed which relates to depreciation, the seller would be permitted to recover twice for such non-existent depreciation: first, through reimbursement from DSS for depreciation, and second, by selling the same at a price in excess of the depreciated cost. To avoid the inequity of this situation, the asset seller is required to repay the depreciation previously

reimbursed by DSS. This is mandated by the above-mentioned regulation.

5. There are many approaches to deal with the problem raised by the Secretary. The most obvious is to rely on the documents of sale which may be interpreted as requiring the purchaser to repay the depreciation previously reimbursed. Another method may be based upon the assumption that the dissolution of Plaintiff's wholly-owned subsidiary requires the Plaintiff to undertake all of the obligations of the subsidiary including the obligation to reimburse. While not ruling on this subject, at this time, the Court merely points out that the Secretary's position in this regard is bottomed on the highly questionable assertion that treating this as a sale of assets in two steps prevents a reimbursement. If the assertion is incorrect, then the argument based thereon is erroneous.

This Court fully recognizes the deference which should be paid to the Secretary's determination, *Volkswagenwerk v. FMC*, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). However, a determination that has neither a logical nor a legal basis cannot be viewed as anything but arbitrary.

For the above reasons, this Court finds that the decision of the Secretary was in error. Plaintiff's acquisition of the extended care facility must be viewed as one transaction. Plaintiff's fixed cost reimbursement rate under the Medicaid Act should be established accordingly.

IT IS SO ORDERED.

EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

CHATEAU GARDENS, INC.,
a Michigan corporation,

FILE NO. 80–40165

Plaintiff,

vs.

JUDGE STEWART NEWBLATT

PATRICIA HARRIS, Secretary of the United States Department of Health and Human Services;
JOHN T. DEMPSEY, Director of the Michigan Department of Social Services,

Defendants.
_____/

STIPULATED STATEMENT OF FACTS

This is an action brought by the Plaintiff, Chateau Gardens, Inc., an enrolled provider of medicaid benefits, against the Defendants John T. Dempsey, Director of the Michigan Department of Social Services ("Director"), and Patricia Harris, Secretary of the United States Department of Health and Human Services ("Secretary"). These state and federal governmental agencies are charged with the responsibility of administering the State of Michigan Medicaid Program, and Title XIX of the Federal Social Security Act (hereinafter referred to as "Medicaid") respectively. MCLA 400.-105–112 and 42 U.S.C. 1396a et seq.

In April, 1977, individuals acting on behalf of the Plaintiff began negotiations with the sole stockholders, officers and directors of Nursing Home Developers, Inc., ("Developers") for the purchase of the Begole Street Extended Care Facility ("Facility"). Prior to the start of such negotiations, the incorporators and eventual stockholders, directors, and officers of the Plaintiff corporation and the stockholders, directors and officers of Developers are claimed to have had no prior business dealings or relationships, and to have dealt with each other on an arms-length basis. The Defendants have no knowledge of facts which indicate a contrary conclusion, and have not, to date, alleged there to have been anything other than an arms-length transaction between the Plaintiff and Developers. The agreement ultimately reached between these parties was the result of a bona fide transaction between them as claimed by Plaintiff and described by the Defendant Director in his October 30, 1978 correspondence to Mr. Martin Stanton of the United States Department of Health and Human Services ("HHS"). (A copy of this letter is attached hereto as Exhibit 1.)

The individuals acting on behalf of the Plaintiff and the owners and officers of Developers reached an oral agreement for the purchase of the Facility's assets shortly after the start of negotiations between these parties. At all times relevant hereto the Plaintiff desired and intended to purchase the Facility's assets from Developers. The stockholders of Developers subsequently requested that the assets to be acquired by means of a capital stock acquisition pursuant to § 332(b) and § 334(b) of the Internal Revenue Code [hereinafter referred to as "I.R.C. § 334(b)(2)"].

On September 28, 1977 the Plaintiff commenced the I.R.C. § 334(b)(2) acquisition. This transaction involved the purchase and redemption of one hundred percent (100%) of the capital stock of Developers, the merger of Developers into the Plaintiff corporation as evidenced by the certificate of merger filed and dated September 30, 1977, attached to the Complaint herein, and the dissolution of the merged corporation. The

purchase price paid by Plaintiff for the I.R.C. § 334(b)(2) acquisition was Two million, three hundred eighty seven thousand ($2,387,000.00) Dollars.

Immediately after the I.R.C. § 334(b)(2) acquisition, the Plaintiff obtained a license to operate the Facility, a new provider agreement with the Michigan Department of Social Services ("DSS"), a new provider number, new bank accounts, legal counsel, and made changes at the facility, including, but not limited to, replacing the administrator and general management personnel.

The Plaintiff treated the I.R.C. § 334(b)(2) acquisition as a purchase of assets on its state and federal income tax returns filed since the date of the acquisition.

In a letter dated September 5, 1978, the Plaintiff was advised by Mr. Dennis Madalinski, agent for the Defendant Director, that because Plaintiff had acquired the assets of the Facility by means of an I.R.C. § 334(b)(2) capital stock purchase, the revaluation of Plaintiff's assets for medicaid reimbursement purposes would not be permitted by DSS. Mr. Madalinski also advised Plaintiff that its assets would have the same value as they had on the accounting records of Developers immediately prior to the date of the Plaintiff's I.R.C. § 334(b)(2) acquisition, and that the Plaintiff would not be reimbursed for the interest expense it would incur on the funds obtained to finance said acquisition. The Defendant Director claims the Plaintiff's (corrected) plant cost component of the medicaid reimbursement rate is $1.95 per patient day.

Under the State of Michigan Medicaid Plan which incorporates Federal Medicaid Regulations, as approved by the Defendant Secretary, the value of the assets purchased by a provider in an arms-length transaction for purposes of calculating the amount of depreciation and the rate of medicaid reimbursement, is limited to the lesser of the fair market value, purchase price, or the current reproduction cost depreciated on a straight-basis over the life of the assets to the time of the sale. 42 CFR 405.415(g). DSS is required pursuant 42 CFR 405.415(f) to recapture from the seller any depreciation expenses claimed by the seller for medicaid reimbursement purposes upon disposal of the assets sold at a gain.

The Plaintiff obtained an appraisal of the assets and claims based upon such asset valuation adjusted for depreciation that its plant cost component of the medicaid reimbursement rate should have been $4.82 per patient day from July 1, 1978 to March 31, 1979, and $4.98 per patient day from April 1, 1979 to the present.[1]

The Plaintiff sought administrative relief from Mr. Madalinski's decision to the Defendant Director and was able to reach an interim agreement on March 28, 1979, as expressed in a Memorandum of Understanding dated April 2, 1979 (a copy of which is attached hereto as Exhibit # 2), setting the Plaintiff's plant cost component of the medicaid reimbursement rate at $4.24 per patient day. This reimbursement rate was to be utilized until a definitive legal opinion on the issue before this court was rendered by the Defendant Secretary or her agents. This opinion, as rendered by the Defendant Secretary's agents on March 25, 1980, stated that the Plaintiff's I.R.C. § 334(b)(2) acquisition should not be treated as a purchase of assets for medicaid reimbursement purposes. It was this opinion which prompted the Defendant Director to advise the Plaintiff that further administrative review of Mr. Madalinski's decision would be unavailable, and that DSS would reduce the Plaintiff's plant cost component of the medicaid reimbursement rate from

1. An issue which has developed in this case is whether the asset appraisal obtained by the Plaintiff was accepted by the Defendant Director throughout the administrative process in this case and thus should be the valuation basis utilized in determining the Plaintiff's medicaid reimbursement rates if it is determined that the Plaintiff's I.R.C. § 334(b)(2) acquisition should be treated as a purchase of assets giving rise to a revaluation of the acquired assets. The Plaintiff and the Defendant Director feel that if they cannot amicably resolve this issue, an evidentiary hearing should be held by this Court to determine the appropriate value of the assets involved in this case.

that set out in the Memorandum of Understanding to the $1.95 rate, and seek to recoup all amounts ostensibly overpaid to the Plaintiff by DSS since July 1, 1978.

The Defendants have refused to recognize a revaluation of the Plaintiff's assets for purposes of medicaid reimbursement because of an asserted long-standing medicare/medicaid policy which does not allow a revaluation of assets where there has been a purchase of stock. This policy was not codified at the time the transaction involved in the instant case was consummated, but was based upon an administrative interpretation of medicare/medicaid regulations 405.427 and 405.626 (42 CFR). The Defendant Secretary proposed a medicare/medicaid regulation which expressly prohibited a revaluation of assets in cases involving a purchase of stock in April, 1977, but this proposed regulation, as found at 42 CFR 405.415(1), was not issued as a final rule by HHS until February 5, 1979, (44 Fed.Reg. 6912). Furthermore, this proposed regulation was not contained in the State of Michigan Medicaid rules, regulations, or guidelines at the time of the Plaintiff's I.R.C. § 334(b)(2) acquisition.

It is agreed that under the Medicare/Medicaid regulations as promulgated by the Defendant Secretary and adopted by the Defendant Director, a revaluation of assets is permitted where there is either a direct purchase of assets or a merger of two unrelated corporations, absent a transfer of stock, up to certain specified limitations. In such circumstances, any interest expense due on the debt obtained to acquire the assets would be reimbursed under the Medicaid Plan.

At issue in the case at bar is whether the Plaintiff's I.R.C. § 334(b)(2) acquisition should be treated as a purchase of assets for purposes of medicaid reimbursement or strictly as a capital stock purchase.

The Defendant Secretary does not stipulate to the facts set forth above, but agrees to be bound during any future litigation with the Defendant Director regarding the revaluation of the Plaintiff's assets, by the Court's declaratory judgment on the legality of the Defendant Secretary's policy refusing to revalue the assets acquired pursuant to an I.R.C. § 334(b)(2) transaction. The Defendant Secretary reserves the right to deny federal financial participation as to payments made or to be made by the Defendant Director to the Plaintiff for reasons based on regulations and policies other than the Defendant Secretary's policy refusing to revalue assets acquired pursuant to an I.R.C. § 334(b)(2) transaction. Moreover, the Defendant Secretary will not be bound by the Court's declaratory judgment on the legality of this medicare/medicaid policy if the Defendant Secretary reaches a final decision that any material fact set forth above is materially false; nor will the Defendant Secretary be so bound if the Court's declaratory judgment is based on factors solely in the control of the Defendant Director.

PLAINTIFF
CHATEAU GARDENS, INC.

BY: (s) Kendall B. Williams
       Kendall B. Williams

Dated 6–26–80

## EXHIBIT 1

WILLIAM G. MILLIKEN, Governor
DEPARTMENT OF SOCIAL SERVICES

300 S. Capitol Avenue, Lansing, Michigan 48926

JOHN T. DEMPSEY, Director

October 30, 1978

Mr. Martin D. Stanton
Regional Medicaid Director
Department of Health, Education and Welfare
Health Care Financing Administration
175 West Jackson Boulevard
Suite A–835
Chicago, Illinois 60604

Dear Mr. Stanton:

Michigan's State Plan for Long Term Care Providers as approved by HEW placed nursing homes on a prospective rate of reimbursement effective July 1, 1978. The formula is cost related and in part defines

allowable costs as ". . . those costs permitted by the Medicare principles of Reimbursement (CFR Title 20, Chapter 3, Part 405, Subpart D) . . ."

This letter conveys an urgent request for an early interpretation for the Medicare Principles of Reimbursement as it relates to values that may be used on the acquisition of depreciable property where the asset acquisition was the result of an Internal Revenue Code section 334(b)(2) stock purchase-immediate liquidation.

Our immediate question: in applying the Medicare Principles, what interpretation will be made by HEW's Health Care Financing Administration Administrator on the following:

(1) an increase in the expenses for depreciation allowances which are the result of depreciable assets being revalued to reflect their cost via the stock-liquidation purchase to the new owners (assuming 100% of the capital stock was purchased and liquidated so that the provider owns the assets directly), and

(2) an increase in interest expense allowance, the result of refinancing to capitalize the purchase.

It is critical to this office that we know the position that HEW auditors will take in determining allowable depreciation and interest expenses where assets have been adjusted to reflect appreciated values in the purchase price of such assets [by means of the Internal Revenue Code asset purchase method of section 334(b)(2)].

The question at this time involves one nursing home having acquired its assets through the purchase-liquidation method of Internal Revenue Code section 334(b)(2) of 100% of the capital stock in a corporation having real and depreciable property; the property's historical costs approximated $1,370,000; after the purchase, the property was revalued to $2,236,788 (appraisal less depreciation adjustments) which was less than the purchase price of $2,387,000. The purchase appears to have been made with borrowed monies.

At this time we believe the purchase was a (bonafide) arms-length transaction, the price was developed from an appraisal performed by a licensed appraiser. Our question is whether HEW will approve a revaluation of assets as determined from the price paid for the assets via the Internal Revenue Code section 334(b)(2) method of purchasing assets. Current reproduction cost depreciated on a straight-line basis for the life of the assets to the time of the sale is a separate principle and is not included in this inquiry.

We will appreciate an early reply to this question so that an appropriate response can be made to one provider's request for rate relief under the prospective formula.

Sincerely,

John T. Dempsey

EXHIBIT 2

STATE OF MICHIGAN

WILLIAM G. MILLIKEN, Governor
DEPARTMENT OF SOCIAL SERVICES

300 S. CAPITOL AVENUE, LANSING, MICHIGAN 48926

JOHN T. DEMPSEY, Director

April 2, 1979

Mr. Ronald Dueck, Administrator
Chateau Gardens, Inc.
627 Begole Street
Flint, Michigan 48503

Dear Mr. Dueck:

We have met periodically during the past few months seeking a solution to reimbursement problems which are due to the acquisition of the nursing home by purchase of capital stock. On March 28, you advised there is an urgent need for an immediate increase in the Plant Cost Component of your current reimbursement rate. It was agreed that if a temporary solution could be agreed upon, it would provide the necessary funds for Chateau Gardens to continue its operation until its request for Waiver is acted upon by Region V.

This letter will serve as our "Memorandum of Understanding" regarding the agreement reached on March 28, 1979:

1. The Plant Cost Component of Chateau Garden's prospective rate will reflect the $4.24 per patient day for the period July 1, 1978 to HEW's date of determination on your plea for a waiver.

2. The $4.24 adjustment will become part of Chateau Garden's prospective rate effective with services April 1, 1979 and thereafter.

3. A request for a gross adjustment for the period July 1, 1978 through March 31, 1979 will be initiated immediately. A gross adjustment will be included in your April warrant.

4. You will be responsible for the preparation of arguments to be presented before the Region V Regional Medicaid Director with documentation and exhibits. You will have your plea in our hands no later than April 18, 1979.

5. It is assumed the plea will be one the State can support and that the package developed by your counsel will be comprehensive in scope. If so, the State will support your request for a waiver of the October 1978 decision.

6. In my letter of transmittal to Mr. Stanton, I will offer to discuss your request with him personally.

I believe the above captures the essential elements of our March 28 agreement. I anticipate receiving your formal request for a waiver with appropriate arguments not later than Wednesday, April 18, next.

If you have any questions, please let me know.

Sincerely,
(s) John T. Dempsey
John T. Dempsey