551 A.2d 628

Manor Health Care Corp. and Leader Nursing Centers, Inc., Petitioners *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued September 12, 1988, before Judges DOYLE, BARRY and McGINLEY, sitting as a panel of three.

*Thomas H. Brock,* with him, *Malcolm J. Harkins, III, Casson, Harkins & Lapallo,* for petitioners.

*Bruce G. Baron,* Assistant Counsel, for respondent.

OPINION BY JUDGE DOYLE, December 14, 1988:

Manor Health Care Corporation (MHC) appeals to this Court from the final order of the Director of the Office of Hearings and Appeals, Department of Public Welfare (DPW), disallowing, upon the recommendation of the Hearing Attorney, certain depreciation costs which were submitted for the purpose of calculating medical assistance reimbursements for the fiscal years 1982 and 1983.

This case arises under Title XIX of the Federal Social Security Act, 42 U.S.C. §§1396-1396q (1984), which establishes the Medical Assistance Program, commonly known as "Medicaid." This program is jointly funded and administered by the federal government and the states which elect to participate.[1] The federal government matches the money appropriated by the states to pay for health care services, including nursing home care. On behalf of our state, DPW contracts with and pays providers of medical services, who provide services to Medicaid eligible persons.

In the case presently before us, MHC negotiated an agreement with the CENCO corporation whereby CENCO granted MHC a one hundred and twenty-day option to purchase all the shares of its subsidiary, the Leader Healthcare Organization (LHO), for thirty million dollars. CENCO, apparently among its other holdings, was the parent and sole stockholder of LHO. LHO was the owner and sole shareholder of Leader Nursing Centers Incorporated (LNCI), a Pennsylvania corporation which owned and operated seventeen nursing homes whose Medicaid payment rates are the subject of

---

[1] Pennsylvania is a participating state. *See* Section 443.1 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §443.1. Section 443.1 was added by Section 5 of the Act of July 31, 1968, P.L. 904.

this appeal. In addition, MHC agreed to commence a tender offer for CENCO itself.

On October 19, 1981, MHC exercised its option and purchased all of the stock of LHO. On May 21, 1982, seven months after completing that purchase, MHC merged LNCI into LHO, and then merged LHO into itself, MHC. The corporations were, therefore, "telescoped," and the only surviving corporation was MHC, which then owned seventeen nursing homes. During this period of time, namely, from October 1981 until May 1982, MHC completed a purchase of CENCO, the former parent and grandparent respectively of LHO and LNCI.

In accordance with DPW regulations, LHO filed final cost reports from the beginning of its facilities' fiscal year to the effective date of the merger of LHO into MHC, *i.e.*, January 1, 1982 to May 21, 1982.[2] These final cost reports were used by DPW to set the 1982 interim per diem rates[3] (interim rates) for MHC's operation of the seventeen nursing homes, effective May 22, 1982 and July 1, 1982. MHC was notified of these interim rates by letters dated July 19, 1982, August 20, 1982, and September 8, 1982. MHC challenged those rates by letter dated September 23, 1982, on the grounds that they did not reflect any of MHC's costs to acquire the LHO facilities.

---

[2] 55 Pa. Code §1181.71(a) states:

The fiscal year for purposes of Medical Assistance payments for skilled nursing and intermediate care facilities will be either January 1 through December 31 or July 1 through June 30 as designated by the facility.

[3] Interim per diem rate is defined as the "rate established by the Department [DPW] for the purpose of making interim payments to the facility pending a year-end cost settlement. The rate is based on the latest adjusted reported net operating costs of the facility." *See* 55 Pa. Code §1181.2

As a new provider entering the Pennsylvania Medical Assistance program, MHC picked up where LHO left off and filed projected cost reports (MA-11's) for the period from the change of ownership on May 22, 1982 to the end of the facilities' fiscal year, December 31, 1982.[4] MHC initially submitted these cost reports with a claim for an increase in basis for depreciation. However, by letter dated April 29, 1983, DPW required that these reports be resubmitted *without* such claims. Consequently, the interim rates effective July 1, 1983,[5] which were derived from the MA-11's, did not reflect a revaluation of MHC's assets based on the cost of acquiring the new facilities. MHC filed a timely appeal from the notices of the interim rates issued by DPW.[6]

On appeal, MHC argues that its purchase of one hundred percent of the stock of LHO, followed by the subsequent merger of LNCI into LHO, and then LHO into MHC, was a single transaction by which MHC in-

---

[4] No explanation was offered by either party as to why the MA-11's used a different year (calendar year January 1 to December 31) rather than the fiscal year of the new provider, MHC.

[5] It is unclear from MHC's and DPW's briefs when the 1983 rates became effective. DPW asserts that it was July 1, 1983 (*see* DPW's brief at 12), MHC asserts June 1 (*see* MHC's brief at 8, 15).

[6] MHC has asked this Court to consider, as a threshold issue, whether DPW had actually considered all of the documents introduced by MHC at the Departmental hearing, as records were missing from the certified record that was originally sent to this Court. MHC previously filed a motion with respect to the omissions in the record, seeking summary judgment, arguing that DPW failed to consider the entire record below. DPW opposed that motion, arguing that the fact-finder's files included the entire record below and that the lack of exhibits in the record was due to clerical error. DPW subsequently supplied this Court with the missing documents. By order dated January 14, 1988, this Court denied MHC's motion under Pa. R.A.P. 1951(b). This Court has reviewed the record and our decision and find that it is consistent with the law.

tended to acquire, and did acquire, the assets and ongoing business of LNCI and its nursing facilities in Pennsylvania. As a result, MHC argues that it is entitled to base its claims for reimbursement on the price paid to acquire the facilities for the fiscal years 1982 and 1983.[7]

As a preliminary matter, DPW concluded that the challenged rates effective May 22, 1982 and July 1, 1982, were properly set because MHC did not claim a step-up in the final cost report filed by LHO from January 1, 1981 through May 21, 1982, and since no step-up was claimed, the interim rates effective May 21, and July 1, 1982, must stand. This Court, however, does not find this to be an accurate depiction of the facts set forth in the record. LNCI did file "final cost reports" for the beginning of its facilities' fiscal year, January 1, 1982 to the date of the merger of LHO and LNCI into MHC, May 21, 1982. This was done in accordance with the Medical Assistance Manual. *See* 55 Pa. Code §1181.73 (a).[8] MHC was not yet able to claim a higher reimbursement or file an MA-11, under Section 1181.67(4) as there had not yet been a change of corporate opera-

---

[7] Pennsylvania's guidelines and procedures for cost-related reimbursement are detailed in the Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities Manual (Manual). The Manual originally appeared at 5 Pa. B. 2928-34 (1974), and has been codified in its current amended form at 55 Pa. Code §§1181.201-1181.274. The Medicare Provider Reimbursement Manual (HIM-15) and the Code of Federal Regulations appropriate to the reimbursement of nursing facility care serve as a supplement to the Manual. *See* 55 Pa. Code §1181.201.

[8] 55 Pa. Code §1181.73(a) provides:

A facility that enters into a termination agreement or agreement of sale is required to file a cost report with the Department within 30 days after the effective date of the termination or transfer and is required to provide financial records to the Department for auditing.

tions.[9] Furthermore, MHC was unable to file an interim report in accordance with 55 Pa. Code §1181.72, as the language of that regulation requires a cost report to cover a period of six months or more.[10]

DPW further argues that MHC did not preserve the right to challenge the interim rates for the period beginning July 1, 1983,[11] due to MHC's failure to include the claims in an MA-11.[12] This Court does not find this to be an accurate reflection of the record either. In fact, all seventeen of the facilities filed MA-11's with DPW for the period beginning May 22, 1982, claiming an increased cost basis reflecting MHC's cost to acquire LHO and LNCI. DPW, however, in a letter dated April 28, 1983, stated that DPW did not view the purchase of LHO by MHC as a stock transaction, and therefore a step-up would not be allowed. DPW requested MHC to resubmit its MA-11 reports using the original cost basis for each facility *prior* to the stock purchase. That is exactly what MHC did. MHC then properly filed an administrative appeal of the rates under 55 Pa. Code

_____

[9] 55 Pa. Code §1181.67(4) provides:

The Department [DPW] establishes interim *per diem* rates on the basis of the following methods:

. . . .

(4)  For facilities entering the program and for facilities in the program with changes of ownership, . . . the facility's projected MA-11 cost report will be used to set the interim rate for Medical Assistance during the initial period of operation pending the filing of the first year-end cost report.

[10] 55 Pa. Code §1181.72 provides in part:

[A] facility may file an interim cost report as justification for an interim rate change. However, the interim report may not be filed prior to January 1 (a report received prior to that date will be returned), and *shall cover a 6-month period*. (Emphasis added.)

[11] *See supra*, 5.

[12] *See supra*, 4.

§1181.101(a)(1), claiming that it was improperly denied reimbursement for its depreciation costs. This Court believes this to have been the appropriate action.

What is left for us to determine as the essential and controlling issue is whether a "step-up" of the capital costs of the acquisition should have been granted.

The Medicare/Medicaid regulations require that participating providers be reimbursed for the reasonable costs of services provided. Capital depreciation of assets is generally recognized as a reimbursable expense. *See* 42 C.F.R. 413.134(a)(b)(f). The amount allowed for the depreciation of an asset is based on the historical cost of the asset, *i.e.*, the cost actually incurred in *acquiring the asset*. *See* 42 C.F.R. 413.134 (a)(2). Assets are revalued or the cost basis is "stepped-up" when assets are transferred and the provider that acquired the assets thereafter depreciates them according to the amount it paid. However, a simple purchase of stock of a corporation will *not* entitle a purchaser to a stepped-up basis. *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130 (D.C. Cir. 1982). It is, therefore, vital to MHC's claim that its transaction (*i.e.*, its purchase of all of the stock of LHO and subsequent liquidation of LHO and LNCI) be deemed an asset acquisition, not merely a purchase of stock. *Richey Manor.*

The leading case on this issue is *Pacific Coast Medical Enterprises v. Harris (PCME),* 633 F.2d 123 (9th Cir. 1980). In *PCME,* a stock purchase agreement was entered into in May 1969, providing for the acquisition of one hundred percent of the stock of Community Hospital. Nine months later, Community Hospital, as a corporate entity, was liquidated and its assets were distributed to PCME. In *PCME,* it was stipulated that the exchange of stock was made between unrelated parties in an arm's length bona fide transaction. The Ninth Circuit found that this was common business practice and that it is generally recognized that a one hundred per-

cent .stock purchase and subsequent liquidation is, in essence, an acquisition of assets, and, hence, a purchase of an ongoing operation entitling the acquirer to a new cost basis.

*PCME* establishes that where it can be shown that the intent of a transaction was an acquisition of assets—even though it occurs through a series of steps—it may be treated as an acquisition of assets, so long as the parties were *unrelated* when the transaction began. However, in order for this "single transaction" rule to apply, there must be evidence that "the acquirer had intended *from the outset of the transaction* eventually to transfer to itself the assets of the acquired company." *Humana, Inc. v. Heckler,* 758 F.2d 696, 705 (D.C. Cir. 1985).

DPW, in determining whether MHC had intended to purchase the assets of LNCI from the outset, looked to MHC's agreement to purchase the stock of CENCO. DPW concluded that this agreement did not express any original intent to merge CENCO's other subsidiaries. We do not believe this reasoning to be supported by the record. Upon examining the record, we believe that the operative transaction that should have been examined by DPW was MHC's purchase of one hundred percent of *LHO's stock* from CENCO, and not the purchase of CENCO, an entirely different corporation with other holdings.[13] At that time, LHO was the parent corporation and sole shareholder of LNCI. Seven months later, all on the same day, MHC merged LNCI into LHO and then merged LHO into itself, MHC. MHC then assumed all debts and obligations of LNCI and LHO. We believe this transaction clearly illustrates an intent on the part of MHC to acquire the assets of both

---

[13] Even if DPW is correct in finding that the operative transaction was MHC's acquisition of CENCO, substantial evidence in the record shows that MHC's tender offer to purchase CENCO was for the explicit purpose of merging LHO and LNCI into itself. *See* DPW's Exhibit E at 12.

LHO and LNCI, and, as did occur, to merge the two companies into itself.[14] Moreover, we believe this transaction to be identical to those routinely determined to be acquisitions of assets. As stated above, LHO facilities were transferred to MHC through the purchase of LHO stock and liquidation of the subsidiary corporation that owned the facilities (LNCI)—a transaction which courts have equated to an asset acquisition. *PCME; Chateau Gardens, Inc. v. Harris,* 497 F. Supp. 133 (E.D. Mich. 1980).

DPW, citing 42 C.F.R. 405.415(1)(2)(ii) in its adjudication, determined that the transaction between MHC and LNCI was between "related parties," and therefore disallowed the depreciation expense submitted by MHC.[15] Again, we do not believe the record supports this finding.[16]

---

[14] DPW, in its brief, referred to the statement of an officer of the Leader Corporation which had been acquired by CENCO. (*See* DPW's brief at 13-14.) DPW stated that the statements made by Leader's president demonstrate that the transaction was not intended to be an acquisition of assets. We believe this argument to be unpersuasive. The transaction in question was between MHC and CENCO. The intent of an officer of the Leader Corporation is clearly not relevant as he had neither direct contact with MHC, nor any way of knowing the intentions of MHC in acquiring LHO or LNCI.

[15] That section currently appears as 42 C.F.R. §413.134(k)(2)(ii).

[16] The Manual defines "related parties" as "an individual or organization that is associated or affiliated with, or has control of or is controlled by, the provider. 'Control,' as used in this definition, means the power to influence or direct the actions or policies of another." *See* 55 Pa. Code §1181.202.

*See also* 42 C.F.R. §413.17(b)(1), which defines "related to the provider" as "the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities or supplies."

By making this assertion, DPW is assuming that two separate transactions have taken place and that the initial sale of LHO stock to MHC has tainted the subsequent transfer and telescoping of its assets with the consequence that the transaction was between related parties. *Chateau Gardens.* This Court does not agree with the reasoning of this argument.

At the time the purchase of LHO was negotiated, MHC and CENCO were two separate and distinct corporations. The purchase price for LHO was established in a bona fide arm's length transaction. When MHC purchased LHO, LHO was parent and sole shareholder of LNCI, and MHC's purchase of LHO was tantamount to its purchase of LNCI. Seven months later, MHC merged the two corporations into itself.

We view this *entire* transaction as a single transaction carried out in two steps, and we believe that the arm's length relationship continued to exist until the transaction was complete. *Id.* Therefore, we do not believe the parties were "related" as DPW asserts.

In its brief, DPW asserts that the *PCME* "test" no longer applies, citing *Fairwinds Manor v. Department of Public Welfare,* 517 Pa. 106, 535 A.2d 42 (1987) and *Mountain Rest Nursing Home, Inc. v. Department of Public Welfare,* 73 Pa. Commonwealth Ct. 42, 457 A.2d 600 (1983). DPW contends that *Fairwinds* and *Mountain Rest* maintain that DPW can preclude step-up under Manual Section IV-D-9-f, found at 8 Pa. B. 2832 (1978), and that under Title XIX no step-up at all is required.[17] We do not agree with DPW's interpretation of the law.

_____

[17] This section of the Manual provides:
The cost basis for depreciable assets of a facility purchased as an ongoing operation shall be the lesser of the purchase price or the fair market value based on the lesser of at least two bona fide appraisals at the time of the sale and less any

*Fairwinds* does *not* endorse a blanket prohibition of all revaluations; it merely suggests that revaluation may be unavailable in a sale of assets among *related* parties, or in a sale of the assets where the provider-facility is not the record titleholder of the asset, situations which we do not face here. *See Fairwinds,* 517 Pa. at 111, 535 A.2d at 44. *Mountain Rest* predicated its provider's revaluation on the production of appropriate documentation, namely, records of the prior owner's depreciation, and the implications of that provider's inability to produce the records. Nowhere in the *Mountain Rest* opinion did our Court pronounce a prohibition of *all* revaluations.[18]

DPW also argues that the recent case law departs from the principles laid out in *PCME*. Again, we cannot agree. *Richey Manor* which is cited by DPW, specifical--

---

straight line depreciation by the prior owner. The sale must be an arm's length transaction consummated in the open market between nonrelated parties, in a normal buyer-seller relationship.

This section of the Manual is now codified, in its amended form at 55 Pa. Code §1181.259(m)(1).

[18] DPW has also cited *Hempstead General Hospital v. Whalen,* 474 F. Supp. 398 (E.D. N.Y. 1979), *aff'd mem.* 622 F.2d 753 (2d Cir. 1980). We believe that case to be distinguishable from the one before us today. In *Hempstead,* Hempstead General Hospital was challenging the constitutionality of New York State medicaid regulations on their face. Those regulations provide that after a transfer, the cost of the capital assets to the buyer of a health-care facility will be the same as the cost of those assets to the seller. In other words, reimbursement rates now paid to present owners of a facility in New York, would, after a sale, be the same amount paid to the new owner *without any increase* for reimbursement of the purchase price. In this case, unlike *Hempstead,* DPW has acknowledged that its regulations *require* a revaluation of assets upon the acquisition of an ongoing facility; however, it must be done fairly. Thus, we find DPW's argument that *Hempstead* is relevant to be unpersuasive.

ly states that transactions deemed as asset acquisitions will receive reimbursement based on the purchase price of the stock. *See Richey Manor* at 133. The portion of the *Richey Manor* decision invoked by DPW is dicta and will not be considered as persuasive authority by this Court. Furthermore, that portion of the *Richey Manor* decision was reconciled with the *PCME* decision in *Humana*, which concluded that a one hundred percent stock purchase and subsequent liquidation is an acquisition of assets, as long as there is an intent to acquire the assets from the outset of the transaction.

Accordingly, for the reasons stated above, this Court will reverse the order of DPW.

### ORDER

NOW, December 14, 1988, the order of the Department of Public Welfare in the above-captioned matter is hereby reversed.

Judge MACPHAIL did not participate in the decision in this case.