Merrimack
No. 95-664

NEW HAMPSHIRE DIVISION OF HUMAN SERVICES

v.

RALPH R. ALLARD & a.

March 17, 1997

*Jeffrey R. Howard*, attorney general (*Suzan M. Lehmann*, assistant attorney general, on the brief and orally), for the plaintiff.

*Sakellarios & Associates*, of Manchester (*Jean-Claude Sakellarios* on the brief and orally), for defendant Ralph R. Allard.

Mammoth Nursing Home, Inc. filed no brief.

BRODERICK, J. Defendant Ralph R. Allard appeals the Superior Court's (*McGuire*, J.) ruling which granted summary judgment to the plaintiff, the New Hampshire Division of Human Services, while denying Allard's cross-motion for summary judgment. The trial court ruled that the plaintiff was entitled to recapture Medicaid depreciation payments made to defendant Mammoth Nursing Home, Inc. (Mammoth) between 1976 and 1985. We affirm.

From 1971 to 1985, Allard, along with his wife and sister-in-law, owned and operated Mammoth, a fifty-five bed nursing home in Manchester. In 1976, Mammoth became a full-time Medicaid provider. As a program participant Mammoth received depreciation

payments from the plaintiff totalling $79,052. These payments were designed to reflect the progressive exhaustion of the nursing home's facility and equipment in the course of caring for Medicaid patients. *See Hoodkroft Convalescent Ctr. v. State of N.H., DHS*, 879 F.2d 968, 969 (1st Cir. 1989), *cert. denied*, 493 U.S. 1020 (1990); *cf.* M. CHIRELSTEIN, FEDERAL INCOME TAXATION 141-42 (7th ed. 1994).

In June 1985, Mammoth and its three shareholders executed a purchase and sale agreement with Richard G. Courville and Associates (Courville), a limited partnership. Courville agreed to acquire Mammoth's real estate and personal property. On September 20, 1985, the shareholders signed a series of documents that transferred their interests in Mammoth to Courville. The shareholders executed a bill of sale which conveyed all of Mammoth's equipment, fixtures, moveable property, supplies, and inventory to Courville. In addition, Allard's wife, as president of Mammoth, signed a warranty deed conveying Mammoth's land and physical plant to Courville. The shareholders also signed a bill of sale for "all the authorized and issued shares of stock" of Mammoth along with a separate indemnity and "hold harmless" agreement shielding Courville from all debts existing "prior to the date of conveyance as specified in the Purchase and Sale Agreement for the sale of Mammoth Nursing Home, Inc. . . . as well as any recapture or attempt to recapture by the State of New Hampshire." The transaction was capped by two promissory notes that Courville endorsed in favor of the shareholders. Following this prodigious exchange of paperwork, Courville leased the assets it had acquired back to Mammoth. The warranty deed, transferring the real property and physical plant, was ultimately recorded on December 19, 1985.

After the 1985 sale, the plaintiff conducted an audit and concluded that the sale to Courville had resulted in a gain of $335,937. The plaintiff sought to recapture the depreciation payments it had previously paid to Mammoth. *See* N.H. MED. ASST. MANUAL 9999.7(b)(4). The defendants refused to pay and requested administrative review. In 1989, after a hearing, the division's director ruled that the plaintiff was entitled to recover the full value of the depreciation payments made to Mammoth in the years prior to the sale. The ruling was not appealed, although the defendants failed to repay the depreciation. The superior court dismissed the plaintiff's initial attempt to enforce the administrative award on the grounds that the applicable statute of limitations had expired. On appeal to this court, the trial court's dismissal was reversed and the case remanded for further proceedings. *N.H. Div. of Human Services v. Allard*, 138 N.H. 604, 607, 644 A.2d 70, 72 (1994). On remand each party moved for summary judgment.

The trial court ruled for the plaintiff. It rejected Allard's argument that the underlying transaction was a stock sale followed by a reorganization and transfer of assets from Mammoth to Courville. Allard asserted that this two-step transaction precluded recapture of depreciation payments because there had been no sale of assets. Applying the analysis in *Chateau Gardens, Inc. v. Harris*, 497 F. Supp. 133 (E.D. Mich. 1980), the court concluded that the parties intended the transaction to be an asset sale from the outset, despite their attempts to later characterize it as a stock sale. This appeal followed.

Allard asserts that the trial court erred in treating the two-step stock sale and asset transfer as a single transaction, when, he argues, it consisted of two distinct phases. For its part the plaintiff argues that the trial court was correct in ruling that "the transfer of assets was not separate from the stock transfer; rather, it was one transfer conducted in two parts." The plaintiff also argues that collateral estoppel bars the relitigation of issues that were determined in the prior administrative hearing. Although the plaintiff's writ and other pleadings specifically referred to the unappealed administrative determination as a matter of historical fact, the plaintiff never argued before the trial court that the defendants were collaterally estopped by the administrative decision. Accordingly, we decline to consider this argument on appeal. *See State v. Chick*, 141 N.H. 503, 688 A.2d 553 (1996). The dispositive issue in this appeal, therefore, is whether the transfer, as described, is more appropriately labeled an asset sale or a stock sale.

In reviewing a grant of summary judgment, we consider the affidavits, and all reasonable inferences drawn from them, in the light most favorable to the non-moving party. *See Dwire v. Sullivan*, 138 N.H. 428, 430, 642 A.2d 1359, 1360 (1994). To the extent that the non-moving party either ignores or does not dispute facts set forth in the moving party's affidavits, they are deemed admitted for purposes of the motion. *See Arsenault v. Willis*, 117 N.H. 980, 983, 380 A.2d 264, 266 (1977).

Under both the Federal Medicare and Medicaid programs, States that receive program funds must reimburse providers for the costs of caring for qualified patients. *See* 42 U.S.C. § 1396a(a)(13)(A) (1994) (Medicaid); *see also Hoodkroft*, 879 F.2d at 969-70 (noting the similarity between the Medicare and Medicaid regulations on depreciation). Depreciation is a reimbursable expense under both programs. *See* N.H. MED. ASST. MANUAL 9999.7(b)(1) (Medicaid); *see also* 42 C.F.R. § 413.134(a) (1996) (Medicare). Depreciation payments, such as those at issue in this case, are designed to reflect

the declining value of a nursing home's assets over time. Conversely, depreciation is *not* paid on assets that retain their usefulness indefinitely, such as stock and land. *Cf.* CHIRELSTEIN, *supra* at 142-43. When depreciation is allowed, the payments are necessarily inexact; therefore, when an item is sold at a gain, this gain, up to the amount of depreciation paid, is "recaptured" by the government as excess depreciation. *See Creighton Omaha Regional Health Care v. Sullivan*, 950 F.2d 563, 565 (8th Cir. 1991).

Under both federal programs, a pure stock sale is not subject to recapture, as the sale does not involve the transfer of depreciable assets from one party to another. *See Humana, Inc. v. Heckler*, 758 F.2d 696, 703 (D.C. Cir. 1985), *cert. denied*, 474 U.S. 1055 (1986); *Chateau Gardens*, 497 F. Supp. at 135; *Manor Health Care v. Dept. of P. Welfare*, 551 A.2d 628, 631 (Pa. Commw. Ct. 1988), *appeal denied*, 562 A.2d 829 (Pa. 1989). On the other hand, it is also well settled that once a depreciated asset is sold for a gain, it is subject to recapture. *Hoodkroft*, 879 F.2d at 969-70. Thus, the characterization of this transaction as either an asset sale or a stock sale is of vital significance to the parties. *Cf. Humana*, 758 F.2d at 705-06.

■ In evaluating the transaction in this case, we adhere to the recognized principle that the substance of the transaction, and not its form, will control the analysis of transfers under the federal programs. *See, e.g., Humana*, 758 F.2d at 705; *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 132-33 (9th Cir. 1980); *Chateau Gardens*, 497 F. Supp. at 135-36; *Manor Health Care*, 551 A.2d at 631. In the leading case on this subject, *Pacific Coast Medical*, the Ninth Circuit Court of Appeals noted that in the corporate sphere a stock sale that is quickly followed by a transfer of assets is considered to be the same as an asset sale. *Pacific Coast Medical*, 633 F.2d at 132. The court also observed that authorities such as the Internal Revenue Service, the Securities and Exchange Commission, and the California Commissioner of Corporations routinely deem stock sales which are followed by reorganizations to be the functional equivalent of straight asset sales. *Id.*

Consequently, when the parties intend an asset sale, the parties' use of certain legal terminology, that might otherwise suggest a stock sale, will not thwart the application of the Medicaid/Medicare reimbursement system. *Id.* at 132-33; *cf. Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & R. Co.*, 442 P.2d 641, 644 (Cal. 1968) (warning against the elevation of certain "magic words" at the expense of the parties' intent). As one court has stated, *Pacific Coast Medical* "establishes that where it can be shown that the intent of a transaction was an acquisition of assets — even though

it occurs through a series of steps — it may be treated as an acquisition of assets." *Manor Health Care,* 551 A.2d at 631. Similarly, the transfer of stock or assets, standing alone, is not decisive evidence of the parties' intent to achieve either type of transaction. *See Lodi Community Hosp. v. Shalala,* 94 F.3d 1251, 1254-55 (9th Cir. 1996).

In the present case, the trial court held that Courville "not only intended but agreed, even before the transfer of [the nursing home] stock, to purchase the nursing home assets." This conclusion is bolstered by the parties' original written agreement which structured the transaction as an asset sale. While the transaction was later divided into smaller segments, the contracts governing each element of the transaction were executed on the same day. This suggests that the stock sale was an integrated part of a much larger transaction. *Cf. Kilroe v. Troast,* 117 N.H. 598, 601, 376 A.2d 131, 133 (1977).

The evidence, taken as a whole, establishes Courville's initial and continued intent, even after the transaction was allegedly restructured, to acquire the assets of the nursing home. We agree with the trial court that Allard's reliance on the purported legal significance of the two-part structure of the transaction is insufficient to demonstrate that the parties did not intend an asset sale. As in *Chateau Gardens:*

> The transaction here was not solely the sale of stock. Rather, [the buyer] had the intent throughout of acquiring the assets as a whole and using them to provide health care services to the residents. The provision of those services is the very purpose of the [Medicaid] reimbursement scheme.

*Chateau Gardens,* 497 F. Supp. at 135-36.

Finally, we do not find merit in Allard's assertion that the continued survival of the nursing home's corporate identity undermines the trial court's determination of intent. The survival of the original provider is one factor, to be considered in conjunction with the other evidence of the parties' intent. *See American Medicorp, Inc. v. Schweiker,* 714 F.2d 68, 70 (9th Cir. 1983) (survival of provider corporation does not preclude application of *Pacific Coast Medical* standard). When, as in this case, the other evidence overwhelmingly demonstrates that the parties intended to sell the assets of the provider, the transaction is appropriately classified as an asset sale, notwithstanding the status of the provider. *Cf. Lodi Community Hosp.,* 94 F.3d at 1255. If we were to adopt Allard's argument, we would be condoning the perpetuation of assetless corporate shells for the sole purpose of Medicare/Medicaid business planning. As we

have just instructed that form should not be allowed to prevail over substance in this area of the law, we decline to substitute one artifice for another.

*Affirmed.*

All concurred.